OPINION
This matter is before the court upon an appeal by Appellant/Cross-Appellee Anthony Harris ("appellant"), from the Tuscarawas County Court of Common Pleas, Juvenile Division, concerning his conviction for the murder of his five-year-old neighbor Devan Duniver. Appellee/Cross-Appellant ("appellee") State of Ohio appeals the juvenile court's decision to partially grant appellant's motion to suppress statements he made to an investigating officer, outside the presence of his mother, while being transported in a police cruiser and at the New Philadelphia Police Department. The following facts are pertinent to the issues that will be addressed in the appeal and cross appeal.
On Saturday morning, June 27, 1998, Devan Duniver and her brother, Dylan Duniver, returned home from visiting with their father, for a week, in Cambridge, Ohio. At approximately 11:30 a.m. that morning, after returning to their apartment, Devan and Dylan went outside to play. Devan played outside for a few minutes and subsequently returned to the apartment where she rested on the couch with her mother, Lori Duniver, until approximately 12:00 p.m. When she got up from the couch, Devan changed her clothes and put on a pair of red shorts and a green Tasmanian Devil T-shirt. Devan again went outside to play.
A little after 12:00 p.m., Devan and Dylan stopped by the residence of Diane Murphy and asked to play with Diane's son, Adrian, and Chris Harris, appellant's brother. The boys indicated they could not come out to play. Thereafter, Devan returned home and was in and out of the apartment. At approximately 1:30 p.m., Lori Duniver told Devan to stay in the apartment while she went upstairs to get ready to go to the grocery store. However, Devan did not remain in the apartment and instead yelled up to Lori something about a little girl and left the apartment. Dale Ruegsegger, the Duniver's next door neighbor, verified that Devan was playing with his daughter, in front of the apartments, at approximately 1:30 p.m.
Lori returned downstairs, at approximately 1:50 p.m., to gather the children in order to go to the grocery store. Devan was not in the apartment. Lori went outside and began calling for Devan. Lori went to the front of the apartment and asked Michael Harris, appellant's brother, whether he had seen Devan. Michael Harris responded that he had not seen her. Lori continued to call for Devan and eventually got in her car and drove to two houses, about one block away, where Devan was known to play. Lori stopped at the Murphy residence and learned that Devan and Dylan had been there earlier in the day. Lori also checked another friend's residence but nobody was home.
At approximately 2:00 p.m., Lori and Dylan returned home and went to the front of their apartment. Just as Lori turned the corner of the apartment building, appellant came around the opposite corner of the building. Lori asked appellant whether he had seen Devan and appellant responded that he had not seen her. Appellant also stated that he had just returned from the school. Lori and Dylan continued searching for Devan. Thereafter, Lori offered appellant $5 to help her look for Devan. Appellant accepted the money, following some hesitation, and assisted in the search.
Later in the afternoon, Lori telephoned family and friends concerning Devan's disappearance. Lori eventually sent appellant home at approximately 5:30 p.m., once family and friends began arriving at her apartment to help in the search. After Lori learned that Devan's playmate, Kaitlyn, was out of town on vacation, Lori became convinced that something was wrong. Lori thereafter contacted the New Philadelphia Police Department at 8:11 p.m. Officer Shawn Nelson responded to the call. Lori provided Officer Nelson with a picture of Devan. Lori also informed Officer Nelson of an incident that occurred in June 1997, when her ex-boyfriend, Jamie Redman, took Devan for approximately two days.
The New Philadelphia Police as well as hundreds of volunteers searched for Devan, through violent thunderstorms, the entire night and early morning hours. The police organized a formal search on June 28 when Devan still had not been found. On that day, at approximately 2:30 p.m., Marsha Cross, an off-duty EMT, found Devan's body in the woods located behind the apartment complex where Devan and appellant lived. Devan's body was found in a small bare spot, in the dense brush, covered with weeds. The path leading to her body was a tunneled-out area of weeds and brush where children were known to crawl on their hands and knees.
Devan's body was covered with dirt and debris and her clothing and hair were wet. There was also substantial insect infestation in the mouth and neck regions. Devan's left foot was near a groundhog hole that was approximately one foot in diameter. There appeared to be a partial shoe print on the side wall of the groundhog hole.
The autopsy revealed that Devan died from seven stab wounds to the front of her neck. The stab wounds partially severed her carotid artery. The autopsy further revealed that Devan had no defensive wounds on her hands. There was evidence of a blow to the top of her head and several other abrasions and contusions on her body. The Stark County Coroner ruled Devan's death a homicide.
Captain Jeff Urban of the New Philadelphia Police Department became the investigating officer. To begin eliminating suspects, Officers Nelson and Skinner investigated the whereabouts of Devan's father, Richard Duniver. Mr. Duniver was able to account for his whereabouts. The Columbus Police Department also verified the whereabouts of Jamie Redman. Captain Urban first contacted appellant about the murder, at appellant's residence, on June 29, 1998. Captain Urban asked appellant if he knew Devan's body had been found. Appellant responded that "* * * she was a nasty little girl and * * * that she would eat in front of him." Tr. Vol. VIII at 1813.
Captain Urban next spoke to appellant, on June 29, 1998, when appellant approached him. During this second conversation, appellant told Captain Urban that he had been at Ryan Eckert's house on June 27 and that Ryan's father dropped him off at his apartment. Id. Vol. VIII at 1816. Appellant then told Captain Urban that he walked home through an area between the sump and the woods. Appellant also stated that he arrived home just before 2:00p.m.
Captain Urban returned to the appellant's residence on July 2, 1998. On this visit, Captain Urban had a discussion with appellant, his mother, Cynthia Harris, and his brother, Michael Harris. Captain Urban tape recorded this conversation. On the tape, appellant stated that he left Ryan Eckert's house a little after 2:00 p.m. Appellant also stated that he walked around the far side of a business located near the wooded area. Captain Urban informed appellant that this was very close to the time that Devan was seen entering the woods. Captain Urban also informed appellant that Ryan Eckert and his mother told him that appellant left their house before 2:00 p.m.
Appellant subsequently changed his statement and told Captain Urban that he walked through the woods, on a little path that goes through the center of the woods, prior to 2:00 p.m. Appellant stated that he did not hear Lori calling for Devan. Captain Urban told appellant that he had some pictures, at the station, that he would like appellant and his brother, Michael, to review. Cynthia Harris agreed to permit her sons to review the pictures and told Captain Urban that she had to get her car keys and went into the apartment. Captain Urban asked appellant to ride with him, in his cruiser, to the police department. When Cynthia Harris returned from retrieving her keys, appellant had already left in Captain Urban's cruiser.
Captain Urban recorded the conversation he had with appellant while driving to the police department. After turning on the tape recorder, Captain Urban read appellant his Miranda rights. During this conversation, appellant mentioned that Devan had thrown part of a brick at him and hit him with it. Appellant also mentioned that a pocket knife was used to kill Devan. Subsequently, Cynthia Harris gave the New Philadelphia Police Department permission to search their apartment. During the search, officers retrieved the clothing and shoes appellant wore the day Devan disappeared. The officers did not discover a knife at appellant's residence.
Captain Urban next spoke to appellant on July 15, 1998, when appellant, Cynthia Harris and Michael Harris went to the police department for purposes of a voice stress test. The voice stress test was to be administered to both appellant and Michael Harris. Chief Thomas Vaughn, of the Millersburg Police Department, had already administered a voice stress test to Dylan Duniver on July 14. Upon their arrival at the police station, Chief Vaughn explained the voice stress test to appellant, his mother and Michael Harris. Chief Vaughn also read a consent form to them. The heading on the form stated: "CONSENT TO COMPUTERIZED VOICE STRESS ANALYZER EXAMINATION (TRUTH VERIFICATION)." Neither appellant nor Cynthia Harris indicated they had any questions and both signed the consent form. Captain Urban and Chief Vaughn both signed the form as witnesses.
Cynthia Harris told Captain Urban that she would like to be in the room with appellant as Chief Vaughn administered the test. Captain Urban informed Cynthia Harris, in appellant's presence, that it was important for appellant and Chief Vaughn to be alone during the test, but that she would be able to watch the testing process through a two-way mirror. Captain Urban also indicated that she would be able to hear the conversation between Chief Vaughn and appellant.
Chief Vaughn explained to Cynthia Harris that he would begin with a pre-test interview which is mandated by the National Institute of Truth Verification as part of the voice stress test procedure. At the suppression hearing, Chief Vaughn testified: "It's to build a rapport. It's for me to be able to establish a rapport with them. It's for me to be able to get him comfortable with me." Id. Vol. I at 245.
Chief Vaughn escorted appellant into an interview room, closed the door, and began recording the interview. Upon entering the room, Chief Vaughn immediately read appellant his Miranda rights. Chief Vaughn explained to appellant that he was not under arrest and that he could leave the room at any time as the door was not locked. After a few questions concerning whether appellant liked sports, Chief Vaughn began questioning appellant. The questioning by Chief Vaughn lasted approximately one hour. During the interview, Chief Vaughn repeatedly accused appellant of killing Devan. Chief Vaughn also made other statements in an effort to get appellant to confess to the murder. Appellant denied his guilt numerous times but subsequently made several incriminating statements. Chief Vaughn never administered the voice stress test.
After making the incriminating statements, Chief Vaughn asked appellant to make a written statement concerning the murder of Devan. At that point, appellant asked for his mother and indicated that he would tell her what happened. When Cynthia Harris entered the room, appellant recanted his incriminating statements and told her that he did not kill Devan. Following several minutes of direct questioning by his mother, appellant continued to deny his guilt. Finally, Cynthia Harris stopped the questioning and stated that she wanted to contact an attorney. Appellant was taken into custody and transported to the Multi-County Attention Center.
On July 16, 1998, the New Philadelphia Police Department filed a complaint, with the Juvenile Division of the Tuscarawas County Court of Common Pleas, alleging appellant murdered Devan Duniver. Appellant entered a denial to the charge on July 24, 1998. On August 17, 1998, and September 1, 1998, appellant filed motions to suppress. The juvenile court set the suppression motions for a hearing on September 28, 1998. On September 21, 1998, the state moved to continue the suppression hearing because defense counsel failed to provide, to the state, the defense's experts' reports. The court granted the continuance. Following the filing of various motions and a Writ of Habeas Corpus, by defense counsel, the juvenile court set a discovery deadline, scheduled the final pre-trial and ordered that the suppression hearing and adjudicatory hearings commence on January 11, 1999. The court further ordered that because this matter would proceed as a bench trial, the suppression issues would be heard within the adjudicatory hearing as necessary. As a result of further motions filed by defense counsel, the juvenile court rescheduled the suppression and adjudicatory hearings for January 25, 1999. The suppression hearing commenced on this date. The juvenile court commenced the adjudicatory hearing on February 4, 1999.
On February 25, 1999, the juvenile court filed a judgment entry partially granting appellant's motion to suppress. The juvenile court overruled appellant's motion to suppress the admission of items found in the search of the Harris apartment on July 2, 1998. The juvenile court granted appellant's motion to suppress statements appellant made to Captain Urban, in Urban's cruiser, on the way to the New Philadelphia Police Department. The juvenile court also suppressed statements appellant made to Captain Urban, at the police department, while outside the presence of his mother. The juvenile court overruled appellant's motion to suppress statements appellant made to Captain Urban, on July 2, 1998, while at the New Philadelphia Police Department, in the presence of Captain Urban and Cynthia Harris. Finally, the juvenile court overruled appellant's motion to suppress statements appellant made to Chief Vaughn, during the questioning, on July 15, 1998.
The adjudicatory hearing concluded on March 4, 1999. On March 10, 1999, the juvenile court found the state had proven, beyond a reasonable doubt, that appellant purposely caused the death of Devan Duniver. On March 17, 1999, the court ordered that appellant be committed to the Department of Youth Services until his twenty-first birthday. The court also imposed a fine of $1,800 and court costs.
Appellant timely filed a notice of appeal. The state filed a notice of cross appeal. The parties set forth the following assignments of error for our consideration:
 I. THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE ADJUDICATION AGAINST ANTHONY HARRIS.
 II. THE JUVENILE COURT ERRED IN DENYING ANTHONY HARRIS' MOTION TO SUPPRESS THE STATEMENTS HE MADE DURING A COERCIVE, CUSTODIAL INTERROGATION ON JULY 15, 1998, BECAUSE THOSE STATEMENTS WERE ELICITED IN VIOLATION OF HIS CONSTITUTIONAL RIGHT AGAINST SELF-INCRIMINATION.
 III. THE JUVENILE COURT VIOLATED ANTHONY HARRIS' STATE AND FEDERAL CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESSES AGAINST HIM BY TAKING JUDICIAL NOTICE OF DISPUTED HEARSAY TESTIMONY FROM A PRIOR HEARING.
 IV. ANTHONY HARRIS WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.
 V. THE JUVENILE COURT'S DEMONSTRATED BIAS AGAINST ANTHONY HARRIS VIOLATED HIS DUE PROCESS RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.
 VI. ANTHONY HARRIS WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A JURY TRIAL.
 VII. THE JUVENILE COURT ABUSED ITS DISCRETION IN SENTENCING ANTHONY HARRIS TO THE DEPARTMENT OF YOUTH SERVICES UNTIL HIS 21ST BIRTHDAY.
 Cross-Appeal I. THE TRIAL COURT ERRED IN FINDING THAT THE CROSS-APPELLEE WAS SUBJECT TO "CUSTODIAL INTERROGATION," AND, THEREFORE ENTITLED TO MIRANDA WARNINGS, WHILE BEING QUESTIONED BY THE INVESTIGATING OFFICER IN HIS POLICE CRUISER AND THE POLICE STATION, OUTSIDE THE PRESENCE OF THE CROSS-APPELLEE'S MOTHER.
 II. THE TRIAL COURT ERRED IN FINDING THAT THE CROSS-APPELLEE FAILED TO KNOWINGLY AND VOLUNTARILY WAIVE HIS MIRANDA RIGHTS PRIOR TO QUESTIONING BY THE INVESTIGATING OFFICER.
 II
We will begin by addressing appellant's Second Assignment of Error as we find it dispositive of this matter on appeal. Appellant contends, in this assignment of error, that the juvenile court erred when it denied his motion to suppress statements he made during a coercive, custodial interrogation on July 15, 1998, because the statements were elicited in violation of his constitutional right against self-incrimination. We agree.
There are three methods of challenging, on appeal, a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. See State v. Fanning (1982), 1 Ohio St.3d 19; State v. Klein (1991), 73 Ohio App.3d 486; State v. Guysinger (1993), 86 Ohio App.3d 592. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. See State v. Williams (1993),86 Ohio App.3d 37.
Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. State v. Curry (1994), 95 Ohio App.3d 93; State v. Claytor (1993), 85 Ohio App.3d 623; Guysiner, supra. In the matter currently before the court, we find appellant challenges the juvenile court's decision concerning the ultimate issue raised in his motion to suppress. Thus, in analyzing this assignment of error, we must independently determine whether the facts meet the appropriate legal standard.
In its entry of February 25, 1999, the juvenile court overruled appellant's motion to suppress on the basis that appellant was not in custody when he made incriminating statements to Chief Vaughn. Judgment Entry, Feb. 25, 1999, at 8. The juvenile court concluded that the "custody" element necessary to invoke Miranda warnings occurred well after appellant made the incriminating statements and the prosecutor was contacted. Id. The juvenile court also concluded appellant understood the Miranda warnings administered by Chief Vaughn and knowingly and voluntarily waived them. Id. at 8-9. Finally, the juvenile court found that Chief Vaughn's persistent questioning did not constitute undue coercion so as to render appellant's incriminating statements involuntary. Id. at 9. Appellant challenges all three of the juvenile court's findings on appeal.
 A. Custodial Interrogation
The United States Supreme Court has emphasized that the admissions and confessions of juveniles require special attention. Haley v. Ohio (1948), 332 U.S. 596. In the case of In re Gault (1967),387 U.S. 1, the United States Supreme Court recognized that constitutional rights, such as right to counsel and the Fifth Amendment privilege against self-incrimination, are applicable to juveniles. Under the case of Miranda v. Arizona (1966),384 U.S. 436, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards have been followed. "Custody" is when a defendant is taken into custody "* * * or otherwise deprived of his freedom by the authorities in any significant way and is subject to questioning * * *." Miranda at 478. The custody must be under the control of the state. State v. Giallombardo (1986), 29 Ohio App.3d 279, 280.
The test in determining whether a defendant is in "custody" is whether a reasonable person, under the circumstances, would think he or she was under arrest. Berkemer v. McCarty (1984),468 U.S. 420, 442. "Custodial arrest * * * [conveys] to the suspect a message that he has no choice but to submit to the officer's will and confess." Minnesota v. Murphy (1984), 465 U.S. 420, 423. The Supreme Court of Ohio has also held that "[w]hen a statement, question, or remark by a police officer is reasonably likely to elicit an incriminating response from a suspect, it is an interrogation." State v. Knuckles (1992), 65 Ohio St.3d 494, paragraph two of the syllabus.
Based on our review of the record in this matter, we conclude that after Chief Vaughn completed asking appellant questions from the Interview Tabulation Sheet and continued to question appellant about his involvement in the murder of Devan Duniver, the questioning became an interrogation because Chief Vaughn asked questions and made comments that were likely to elicit incriminating responses from appellant.
At the suppression hearing in this matter, Chief Vaughn testified to the purpose of the pre-test interview. Chief Vaughn stated that the pre-test interview is necessary "* * * so that you can determine what their understanding of the questions or the subject that you're going to be talking about. You try to build a rapport to release as much stress as you can before you start the test." Tr. Vol. I at 240, 245. Chief Vaughn also described the pre-test interview as "* * * a relaxing period so that we both become familiar with each other and comfortable with each other." Id. at 246. Chief Vaughn also explained that the questions from the Interview Tabulation Sheet are part of the pre-test interview. Id. at 249.
On cross-examination, Chief Vaughn admitted that four or five pages into the transcript of the interview conducted on July 15, 1998, he completed asking the questions from the Interview Tabulation Sheet. Id. Vol. II at 331. However, Chief Vaughn further stated that the questions contained in the Interview Tabulation Sheet are not all of the questions that are part of the pre-test interview. Id. at 331, 332. Chief Vaughn characterized the questions he continued to ask appellant, after completing the questions from the Interview Tabulation Sheet, as pre-test interview questions or follow-up questions. Id.
After reading the transcript and listening to the tape recording of the interview, we find that Chief Vaughn's continued questioning of appellant, after completing the questions from the Interview Tabulation Sheet, resulted in a custodial interrogation. Almost immediately, Chief Vaughn began accusing appellant of the murder and asking questions that were reasonably likely to elicit incriminating responses. Chief Vaughn first indirectly accused appellant by asking appellant "Can you think of any reason why the lab might come back and say that there was blood of the victims in your pockets? Could there be blood of the victim's in your pockets?" Id. Vol. I at 267. Appellant responded "No." Id. Chief Vaughn next asked appellant "Any reason why your shoe prints would be real close to where she was found?" Id. Appellant again responded "No." Id.
Following several more pages of questioning, Chief Vaughn directly asked appellant "Did you do this crime, Anthony?" Id. at 271-272. Appellant responded "No." Id. at 272. Chief Vaughn immediately asked "Are you sure about that?" Id. Appellant responded "I'm sure." Id. Four questions later Chief Vaughn asked appellant "You're sorry you did this, aren't you. You didn't mean to kill her, did you?" Id. at 273. Appellant responded "I didn't kill her." Id.
At this point, Chief Vaughn became more persistent with his questioning. Chief Vaughn stated to appellant "I think that both of us know that something happened out there and see, that's the thing that you got to tell me. You got to tell me what she did to make you so mad. Because I don't think you did it just to — I don't think you were hiding behind no tree just to, just to do it. * * * I don't think you planned on doing this and I'd like to help you out of this, Anthony, * * *. Now I just assume (sic) not have to turn my instrument on, I just assume (sic) not have you take a test if you did this because I think you did. I'll be honest with you, I think you did and you know you did but if I do the test, then we're sort of stuck with me doing the test on you, do you understand?" Id. at 273-274. In his next question to appellant, Chief Vaughn asked appellant "You want to take back what you did to her, don't you? Can you tell me why, what she did to make you so mad?" Id. at 275.
Finally, prior to appellant making his first incriminating statement, Chief Vaughn made the following statement: "If you just happened to be walking through the woods, which I think is what happened and she was there and she did something nasty to you and you just snapped. You said you little nasty kid and you chased her after you did this. That's what happened, isn't it? That's what happened, isn't it, Anthony?" Id. at 279.
Pursuant to the record of the questioning by Chief Vaughn, we find a reasonable twelve-year-old child would think he was under arrest. We are persuaded that this type of questioning conveyed to appellant that he had no choice but to submit to Chief Vaughn's will and confess to the murder of Devan Duniver. Further, this questioning took place in an interview room at the New Philadelphia Police Department. The door to the interview room was closed during the questioning. Id. at 246. Although Chief Vaughn informed appellant that he was free to go and the door was not locked, due to the nature of the questions asked by Chief Vaughn and Chief Vaughn's repeated statements, to appellant, that he knew appellant committed this murder, we do not believe appellant thought he could terminate the questioning and walk out of the room.
Thus, we disagree with the juvenile court's conclusion that appellant was not in custody, on July 15, 1998, while being questioned by Chief Vaughn. Chief Vaughn's pre-test interview of appellant, for purposes of a voice stress test, became a custodial interrogation after he completed asking appellant questions from the Interview Tabulation Sheet.
 B. Waiver of Miranda Rights
Having found that appellant was in custody during the interview on July 15, 1998, we must next determine whether appellant knowingly, voluntarily and intelligently waived his Miranda rights. Chief Vaughn did not read appellant his Miranda rights in the presence of his mother, Cynthia Harris. Instead, once Chief Vaughn obtained consent to perform the voice stress test, he took appellant to the interview room where he intended to conduct the test. After entering the room and turning on the tape recorder, Chief Vaughn read appellant his Miranda rights as follows:
 VAUGHN: Before we get started, Anthony, I need to read something to just, just so that I'm sure that you understand, okay.
ANTHONY: Okay.
 VAUGHN: You know you have the right to remain silent, you don't have to talk to me, you don't have to say anything if you don't want to. Anything you say can and will be used against you in the court of law, understand that?
ANTHONY: Au-hau.
 VAUGHN: Okay. You have the right to consult, to talk to an attorney or have an attorney present while I'm talking to you. Do you understand that?
ANTHONY: Yeah.
 VAUGHN: Okay. If you cannot afford a lawyer, one will be appointed at the expense of the court to represent you. Okay, do you understand all that?
ANTHONY: Yeah.
 VAUGHN: And you're free to go. Your mom is watching from, from behind that glass so she can see what's going on. So she can see I'm not threatening you or doing anything else. We're just trying to get this test done, and, you know, if you don't like what I'm asking you, you can say, wait a minute, let's stop, I want to go talk to mom, or I want to leave, or I don't like it here. You are willing to do that? That door's not locked, you can walk right out that door, okay? And you know, you can stop answering questions at anytime you like. We do need to try to get through the test and I certainly need you to answer my questions in order to do that, okay?
ANTHONY: Okay.
Id. at 259-260.
The juvenile court found that appellant knowingly, voluntarily and intelligently waived his Miranda rights. The juvenile court concluded that the explanation of Miranda rights Chief Vaughn gave to appellant went beyond the actual warnings and was stated in plain, non-technical, simple language. Judgment Entry, Feb. 25, 1999, at 9. The juvenile court further concluded that appellant understood his rights enough to decline to write a statement and ask for his mother. Id.
The United States Supreme Court has emphasized that admissions and confessions of juveniles require special attention. Haley v. Ohio (1948), 332 U.S. 596. Custodial statements are not admissible unless the state can prove that the defendant knowingly, voluntarily and intelligently waived his or her Miranda rights. In the case of In re Gault, supra, at 55, the United States Supreme Court stated:
 We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique — but not in principle-depending upon the age of the child and the presence and competence of parents. * * * If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.
The Ohio Supreme Court has rejected the rule accepted in other states that both a juvenile and his parents or guardian must be informed of the juvenile's rights to an attorney and to remain silent prior to any custodial interrogation in order for any statement or confession by the juvenile to be admissible at his or her trial. Instead, in Ohio, in order to determine whether a juvenile has waived his or her rights to remain silent and to have the assistance of counsel, we must examine the totality of the circumstances surrounding the waiver. Bobo, supra, at 689; In re Watson (1989), 47 Ohio St.3d 86, 89.
The totality-of-the-circumstances approach requires an inquiry into all the circumstances surrounding the interrogation. This includes the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. State v. Edwards (1976),49 Ohio St.2d 31, paragraph two of the syllabus.
On July 15, 1998, when Chief Vaughn questioned appellant he was twelve years old. There is no indication from the record that appellant suffered any physical deprivation or mistreatment while Chief Vaughn questioned him. In fact, from the taped recording of Chief Vaughn's questioning, it is clear that Chief Vaughn at all times spoke to appellant in a regular tone of voice. Chief Vaughn never raised his voice or yelled at appellant. However, due to the nature of the questions asked by Chief Vaughn, Vaughn's numerous statements accusing appellant of this crime, and appellant's emotional state, we find the interview was very intense. There is no indication, in the record, that Chief Vaughn threatened or induced appellant to waive his Miranda rights. Chief Vaughn only interviewed appellant once and the interview lasted approximately one hour. The record also indicates that appellant had no prior criminal experience.
As to appellant's mentality, Dr. Kathleen Quinn, assistant director of psychiatry training at the Cleveland Clinic Foundation, testified that appellant has normal intelligence for a child his age. Tr. Vol. II at 495. Dr. Quinn also testified that within a reasonable degree of medical certainty, appellant was not competent to appreciate his Miranda rights and waive them. Id. at 514. Dr. Steven Neuhaus, a clinical psychologist at University Hospitals Health System, also testified as to appellant's mentality. Id. at 578. According to Dr. Neuhaus, within a reasonable degree of medical certainty, appellant was not able to knowingly, voluntarily and intelligently waive his Miranda rights. Id. Vol. III at 652.
The state did not present a witness to rebut the testimony of the above two witnesses concerning appellant's ability to understand the Miranda warnings. However, on direct examination, Dr. Neuhaus testified that appellant had an IQ of 102 which is normal. Id. at 598. On cross-examination, Dr. Neuhaus agreed the reading level of the Miranda warnings is approximately eighth grade equivalent. Id. at Vol. III at 674. The state relies on this to establish that appellant was capable of understanding the Miranda warnings.
Finally, in Bobo, supra, at 690, the Eighth District Court of Appeals stated that the presence or absence of a parent is a factor to consider in the totality of the circumstances surrounding the statement. As noted above, appellant's mother was not present when Chief Vaughn read appellant his Miranda rights. For whatever reason, Chief Vaughn chose to read appellant his Miranda rights after he separated appellant from his mother.
Since appellant's mother was present at the New Philadelphia Police Department and had just consented to the voice stress test, the better approach would have been for Chief Vaughn to obtain a waiver of appellant's Miranda rights in the presence of his mother. We believe a reasonable twelve-year-old child would not make a distinction between consenting to take a voice stress test and waiving his Miranda rights. Especially when appellant's mother had just given her consent for the test and appellant was under the impression that his mother wanted him to take the test. Thus, having failed to read appellant his Miranda rights in the presence of his mother, this factor negatively impacts on whether appellant made a knowing, voluntary and intelligent waiver.
We conclude, based on the above evidence, that due to appellant's age, the intensity of the interview, the lack of appellant's criminal experience, and the absence of his mother when appellant allegedly waived his Miranda rights, appellant's waiver was not knowing, voluntary and intelligent. We also find Chief Vaughn's explanation of appellant's Miranda rights was not sufficient in that it did little more than convey the basic Miranda warnings to appellant. The only explanation Chief Vaughn provided to appellant, above and beyond the basic reading of the Miranda rights, is the following comment made by Chief Vaughn: "* * * [Y]ou're free to go. * * * if you don't like what I'm asking you, you can say, wait a minute, let's stop, I want to go talk to mom, or I want to leave, or I don't like it here. * * * That door's not locked, you can walk right out that door, okay? And you know, you can stop answering questions at any time you like. We do need to try to get through the test and I certainly need you to answer my questions in order to do that. * * *" Tr. Vol. I at 260.
Further, Chief Vaughn admitted to the following on cross-examination:
 MR. LOCONTI: * * * And so by looking at that transcript and the tape that we've just read and the portion of the transcript that you've just read, you can agree with me, can't you, that what you just read is all that you did with respect to the Mirandizing procedure on Anthony Harris; is that correct?
CHIEF VAUGHN: Yes.
 MR. LOCONTI: Okay. You did not take any other efforts to explain to Anthony what any of those rights meant or to explain to him what each of those different items you were reading to him or telling him meant to him; is that fair?
CHIEF VAUGHN: That's fair.
 MR. LOCONTI: And you did not take any other steps to question him about what his understanding was of those different items that you read to him, correct?
CHIEF VAUGHN: Other than asking if he understood.
 MR. LOCONTI: And when he would respond yes or yeah, you did not make any inquiry to understand what was in his mind when he answered yeah or yes; is that fair?
CHIEF VAUGHN: That's fair.
Id. Vol. II at 326-327.
Even though Chief Vaughn told appellant that he did not have to answer his questions, in the same sentence he made it clear that appellant needed to complete the test and appellant would have to answer his questions in order to do that. Such a statement by Chief Vaughn sent a mixed message to appellant. Thus, based on the minimal explanation of his Miranda rights and the other factors addressed above, we disagree with the juvenile court's conclusion that appellant knowingly, voluntarily and intelligently waived his Miranda rights.
 C. Undue Coercion
Even if we were to conclude that appellant was not in custody or that he was in custody and that he knowingly, voluntarily and intelligently waived his Miranda rights, we still find the incriminating statements made by appellant, to Chief Vaughn, were the result of undue coercion and therefore inadmissible at the adjudicatory hearing.
In concluding that appellant's incriminating statements were not the result of undue coercion, the juvenile court found that although Chief Vaughn was persistent in his remarks to appellant, this is permissible under a lawful homicide investigation and does not constitute coercion or violations of Miranda. Judgment Entry, Feb. 25, 1999, at 9. The factors contained in Edwards, supra, that we considered in determining whether appellant knowingly, voluntarily and intelligently waived his Miranda warnings, are the same factors we must consider in determining whether appellant's confession was coerced.
Although we have already addressed these factors as they pertain to the waiver of appellant's Miranda rights, we find it necessary to further address Chief Vaughn's use of threats or inducements, as applied to the voluntariness of appellant's incriminating statements, as this factor is pivotal in the case sub judice. Again, it is important to remember that Chief Vaughn used these techniques on a twelve-year-old child that was entering seventh grade.
We will discuss the following techniques we find resulted in appellant making coerced admissions. Chief Vaughn began by first making a distinction between two different types of people that would have committed this crime. Chief Vaughn never gave appellant the option of being a person that did not commit the crime. For example, Chief Vaughn explained to appellant "There's the dishonest people that that (sic) meant to do it and did it out of spite, did it out of meanness or there's people that it just happened. And if there is anything in the world that they could take back, it's doing that crime and hurting her." Tr. Vol. I at 271. Further into the interview Chief Vaughn again stated "* * * either you're fooling me and fooling your mom and you're just a spiteful kid that just didn't like her and you just killed her. Just plain, your're nasty, you hid it well from your mom and other kids that you're alone in the woods there and that spite came out or you're the kind of kid I think you are that I think you know who your mom thinks you are, you're a stand-up guy. You stand up for other people, but when you were in the woods she did something to really piss you off and you did something out of character." Id. at 276.
Chief Vaughn then made it clear that there was only one type of person he could help. He explained to appellant "Now the only thing that we have to find out is what kind of person you are, what of those two people are you. Are you the good person on this side or are you the nasty person that's just hiding behind the person you are, proving wrong to everybody? Now, this is that person that I think you are, and that's the person I want to present to Court, okay. That's the person that I'll help. This person, you know, I can't help that person, bottom line. If you're not honest with me, if you don't care about me, then you don't want my help and I can't help you." Id. at 277. Finally, Chief Vaughn concluded with this technique by stating "You're either the nasty person or the decent person and it's the choice that you've got to take (sic), either the nasty person. I mean, are you a mean and nasty kid underneath and you're just waiting to strike out at somebody?" Id. at 278. By the use of this technique, we find that a twelve-year-old boy would believe he had no choice but to be the decent person that for whatever reason committed this crime.
Chief Vaughn also used the voice stress test as a mechanism to persuade appellant to make admissions. Chief Vaughn stated to appellant "* * * I can't help you if you're not honest with me and you know I will be able to tell, once I give the test, if you're telling the truth. I'll know that. And again, I would like to know before I give the test, so that I don't have to send the Court or the prosecutor's office or anybody else I listed on there that I did the test and Anthony lied to me on this test. That's the worst thing in the world that could happen here. * * *" Id. at 272. Shortly thereafter, Chief Vaughn again stated to appellant "Now I just assume (sic) not have to turn my instrument on, I just assume (sic) not have you take a test if you did this because I think you did. I'll be honest with you, I think you did and you know you did but if I do the test, then we're stuck with me doing the test on you, do you understand?" Id. at 274.
Chief Vaughn even went so far as to tell appellant that the results of the voice stress test would be admitted at an adjudicatory hearing even though Chief Vaughn testified at the suppression hearing that he knew they would not be admissible. Id. Vol. II at 346. This is evidenced by the following statement Chief Vaughn made to appellant: "When your test results come back that, you know, whether you tell me or not doesn't matter because those test results are going to stand on there own and it's just like any other evidence, it will be introduced in Court and the punishment is going to be at the end." Id. Vol. I at 274.
Again, Chief Vaughn told appellant that it would be better for him to just tell him what happened instead of taking the voice stress test. "If we take the test and we go through it and I have to say you're not telling the truth verses you and I talking about what happened, how it happened and and getting it down so that you have the opportunity to tell your side, * * *." Id. Finally, Chief Vaughn informs appellant that if he has to administer the voice stress test, he will be past the point where he can help him. "* * * I want to get through this because I've done this for a lot of years and I know how to tell when people are telling me the truth or not. Sometimes it takes me to running the test and showing them, look, this is where you lied to me, but I'm sort of past the point that I can help that person." Id. at 277.
We find these series of statements conveyed to appellant that it would be better for him to tell Chief Vaughn what happened rather than take the voice stress test, because once he had the results of the test and if appellant failed the test, Chief Vaughn would no longer be able to help him. However, prior to entering the interview room with Chief Vaughn, Chief Vaughn made it very clear to both appellant and his mother that he wanted to administer the test, not as a last resort method of determining appellant's guilt, and that the test would be administered in a non-confrontational setting so appellant would be calm and relaxed. The record establishes that this is not what happened once Chief Vaughn and appellant entered the interview room. Instead, the interview became confrontational almost immediately. Further, instead of calming appellant down prior to administering the test, Chief Vaughn had appellant in tears at one point. Id. Vol. II at 386.
We also note details about this crime that Chief Vaughn offered to appellant in his attempt to induce appellant into making a confession and which appellant incorporated in his guilty admissions. Chief Vaughn asked appellant how many times he stabbed Devan. Appellant responded that he did not know. Id. Vol I at 281. Chief Vaughn asked him whether it was five or six times. Id. Appellant responded "No." Id. at 282. Chief Vaughn suggested one or two times and appellant stated "Probably twice." Id. Further, Chief Vaughn was the first person to mention that Devan was found with one leg in a groundhog hole. This portion of the interview is as follows:
 VAUGHN: Okay. Now, she was found sort of underneath some brush and her one leg was in, what I — I've not been there, like I said before, I'm not lying to you, just coming in here so I don't know all the particulars, but it looks like it was a groundhog hole or something. Do you know what I'm talking about?
ANTHONY: Yeah.
VAUGHN: Did you see the groundhog hole when you were stabbing her?
ANTHONY: No.
VAUGHN: You just knew it was there from before?
ANTHONY: I just knew it from before.
Id. at 293.
Finally, another fact Chief Vaughn suggests to appellant concerns when appellant returned the knife to Zach Ellwood. This conversation is as follows:
VAUGHN: Did you give it to him yourself?
ANTHONY: Au-hau.
VAUGHN: Or did you hide it at his house?
ANTHONY: I gave it to him the next day.
 VAUGHN: Okay. And it was, you know it wasn't that night? You or you are just not sure?
ANTHONY: I'm not sure.
 VAUGHN: It could have been that night or it could have been that next day? I'm not trying to confuse you, I just want I just want to get everything down correctly, okay.
ANTHONY: It could be the next day, I don't know.
 VAUGHN: Okay, Let me ask you this, do you know how many days after you, you did this, was it that you gave him back the knife? Could it have been a week?
ANTHONY: Probably.
Id. at 295-296.
Appellant clearly states when first asked when he returned the knife that he did so the day after the murder. Id. at 295. However, as Chief Vaughn continued to question him about this, appellant was unsure and when Chief Vaughn asked him whether it could have been a week later, appellant responds "Probably." Id. at 296. The above facts represent pertinent details of this crime which we find Chief Vaughn suggested to appellant. It also appears from appellant's responses that he was attempting to agree with whatever Chief Vaughn said to him.
Based on appellant's age, lack of criminal experience, and length of the interview, in conjunction with the statements made by Chief Vaughn to get appellant to confess to this crime, we disagree with the juvenile court's conclusion that appellant's confession was voluntary, as it pertains to the portion of the interview conducted by Chief Vaughn.
After making guilty admissions and prior to making a written statement, appellant asked to speak with his mother. Appellant told Chief Vaughn that he would tell her what happened. At that point, Cynthia Harris, Captain Urban and Chief Vaughn returned to the interview room and all three began asking appellant more questions about the crime. For the reasons stated above, the questions Chief Vaughn asked appellant and appellant's responses during this portion of the interview should have been suppressed by the juvenile court. Further, for these same reasons, the questions asked by Captain Urban and appellant's responses should have also been suppressed.
During this portion of the interview, Cynthia Harris asked very direct questions concerning appellant's involvement in this matter. Because appellant seeks to have the entire interview suppressed, we must determine whether the trial court's decision not to suppress that portion of the interview, where Cynthia Harris questioned appellant about his involvement in the murder, is against the manifest weight of the evidence.
The Ohio Supreme Court addressed a similar question in State v. Watson (1971), 28 Ohio St.2d 15. In Watson, a defendant made incriminating statements to a newspaper reporter. The trial court permitted the newspaper reporter to testify about the statements the defendant made to him because no law enforcement officers participated in the questioning by the reporter. Id. at 26. On appeal, defendant argued that the trial court erred in refusing to suppress his in-custody statements made to the reporter without determining whether such statements were influenced by earlier statements made by him to the police. Id.
The Court ultimately held that:
 Inasmuch as custodial interrogation, as defined in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, means `questioning initiated by law enforcement officers after a person has been taken into custody,' the Miranda requirements do not apply to admissions made to persons who are not officers of the law or their agents, and a statement made by a defendant, who is in custody, * * * is admissible whether or not it may have been influenced by earlier statements made by the defendant to the police. Id. at paragraph five of the syllabus.
Prior to its decision in Watson, the Court reached a similar conclusion in State v. Bolan (1971), 27 Ohio St.2d 15, that:
 * * * [T]he duty of giving `Miranda warnings' is limited to employees of governmental agencies whose function is to enforce law, or to those acting for such law enforcement agencies by direction of the agencies; that it does not include private citizens not directed or controlled by a law enforcement agency, even though their efforts might aid in law enforcement. Id. at 18.
Based on the above case law, we conclude that although appellant was in custody when Chief Vaughn questioned him about Devan's murder, the questioning conducted by Cynthia Harris was not a custodial interrogation because Cynthia Harris is not a law enforcement officer nor did she act as an agent for Chief Vaughn or Captain Urban while questioning appellant on July 15, 1998. Had Captain Urban asked Cynthia Harris to help him question appellant, as he did on July 2, 1999, we would have reached a different conclusion. See State's Exhibit L, Interview July 2, 1998, at 25. Accordingly, we agree with that portion of the trial court's decision denying appellant's motion to suppress statements appellant made to his mother Cynthia Harris, during questioning by her on July 15, 1998.
Appellant's Second Assignment of Error is sustained in part and overruled in part. We will not address appellant's Assignments of Error One, Three, Four, Five, Six, and Seven as they are moot based on our disposition of appellant's Second Assignment of Error.
 Cross-Appeal I
Appellee State of Ohio argues, in its First Assignment of Error on cross-appeal, that the trial court erred when it found appellant was subject to custodial interrogation when Captain Urban questioned him in his police cruiser and at the New Philadelphia Police Department, outside the presence of appellant's mother, on July 2, 1998. We disagree.
In this assignment of error, appellee does not appear to be challenging the juvenile court's findings of fact. Nor does appellee claim the juvenile court failed to apply the appropriate test or correct law to the findings of fact. Instead, appellee claims the juvenile court failed to correctly decide the ultimate or final issue raised in appellant's motion to suppress. In reviewing this type of claim, we must independently determine, without deference to the juvenile court's conclusion, whether the facts meet the appropriate legal standard. Curry, supra, at 96; Claytor, supra, at 627.
In its judgment entry, the juvenile court found that a custodial interrogation commenced when Captain Urban placed appellant in his police cruiser and drove him to the police department and continued until appellant's mother was brought to him at the police department. Judgment Entry, Feb. 25, 1999, at 7. The juvenile court further concluded that although Captain Urban gave appellant Miranda warnings, he did so in a cursory manner and appellant was not given an opportunity to fully understand their meaning and therefore, did not knowingly and voluntarily waive them. Id.
As discussed above, in appellant's Second Assignment of Error, the applicable test in determining whether a defendant is in "custody" is whether a reasonable person, under the circumstances, would think he or she was under arrest. Berkemer, supra, at 442. Further, "* * * when a statement, question, or remark by a police officer is reasonably likely to elicit an incriminating response from a suspect, it is an interrogation." Knuckles, supra, at paragraph two of the syllabus.
Our review of the record indicates that Captain Urban's questioning of appellant, on July 2, 1998, while in the police cruiser and outside the presence of appellant's mother, was more than a mere general investigatory questioning of a witness. As soon as Captain Urban had the opportunity to separate appellant from his mother, he did so. Captain Urban asked Cynthia Harris, appellant and appellant's brother, Michael, to come to the police station to review some photographs. Tr. Vol. I at 82. Cynthia Harris agreed and went into the apartment to retrieve her car keys. Id. As soon as Cynthia Harris left to get her car keys, Captain Urban quickly placed appellant in the front seat of his police cruiser and departed. Id. Cynthia Harris exited her apartment just in time to see Captain Urban pulling away in his cruiser with appellant inside. Id.
Captain Urban tape recorded the conversation he had with appellant while driving to the police department. Almost immediately upon entering the cruiser, Captain Urban read appellant his Miranda rights:
 * * * Okay, on the way here, it's policy for us, you have the right to remain silent, anything you say can and will be used against you in a court of law. You have the right to talk to an attorney, have him present with you while you're being questioned. If you can't afford an attorney, one will be provided for you prior to any questioning if you so desire. We have to do that any time I transport you in the car. Do you understand your rights, yes or no? Id. Vol. I at 113.
Captain Urban then proceeded to ask appellant questions that were clearly designed to elicit incriminating responses. Specifically, Captain Urban asked appellant whether there was anything he was not telling him; whether appellant owned a knife and where he could find a knife; why, hypothetically, appellant would have killed Devan; and what clothes appellant wore the day of Devan's murder. Id. at 114-116. Captain Urban also explained, to appellant, that the logical interpretation of the evidence was that appellant killed Devan.
 So Devan goes in the woods at one forty five or last seen about one forty five and you're in the woods at maybe five minutes or three minutes to two and something happens to her just about the same time. But there's nobody else in the woods but you and her at that time. What does that tell you? Id. at 117-118.
Once at the police department, Captain Urban directly asked appellant whether he stabbed Devan. State's Exh. L at 15.
Based on the series of questions asked by Captain Urban, we agree with the juvenile court that a reasonable twelve-year-old child would not believe that he could terminate the questioning and leave. During the period of time appellant was in the cruiser, the most appellant could have done was refuse to answer Captain Urban's questions. However, it is unlikely a reasonable twelve-year-old child would refuse to answer questions when he is in a police cruiser and a police officer is accusing him of committing murder and states that independent evidence proves it. Clearly, at that point, he could not get out of the moving cruiser and walk away. We agree with the juvenile court that once appellant's mother arrived in the room, at the police department, the tone of the questioning changed and the custodial interrogation by Captain Urban terminated.
Thus, under a de novo review, the facts of this case meet the appropriate legal standard. The trial court did not err when it partially granted appellant's motion to suppress statements he made to Captain Urban on July 2, 1998.
Appellee's First Assignment of Error on cross-appeal is overruled.
 II
In its Second Assignment of Error on cross-appeal, appellee contends that the juvenile court erred when it failed to find that appellant knowingly and voluntarily waived his Miranda rights prior to questioning by Captain Urban. We disagree.
As with appellee's First Assignment of Error on cross-appeal, we must determine, under a de novo review, whether the facts of this case meet the appropriate legal standard. The juvenile court found that appellant did not make a knowing and voluntary waiver of his Miranda rights because they were given in a cursory manner and appellant was not given an opportunity to fully appreciate their meaning. Judgment Entry, Feb. 25, 1999, at 7. As previously discussed in appellant's Second Assignment of Error, we apply a totality-of-circumstances approach in determining whether a valid waiver exists. Bobo, supra, at 689.
We have previously addressed several of these factors, which remain a constant, and we do not need to address again. However, we do need to consider the length and intensity of the interview, frequency of interrogation, existence of physical deprivation or mistreatment, and the existence of threat or inducement. Captain Urban questioned appellant for approximately fifteen minutes, in his police cruiser, as he drove appellant to the police department. The record further indicates Captain Urban continued to question appellant, at the police department, outside the presence of his mother. During this time with appellant, Captain Urban asked direct questions that were likely to elicit incriminating responses from appellant. There is no indication of physical deprivation or mistreatment. However, as noted above, the questions asked by Captain Urban were likely to elicit incriminating responses.
Finally, we agree with the juvenile court that although Captain Urban read appellant his Miranda rights, he never explained them to appellant nor did he inquire of appellant to determine whether he understood what he was waiving. Captain Urban merely asked appellant if he understood and appellant responded "yes." Tr. Vol. I at 113. As a twelve-year-old child, we do not believe appellant knowingly, voluntarily and intelligently waived his Miranda rights. Based on the above, we agree with the juvenile court's conclusion that appellant did not make a valid waiver of his Miranda rights. Appellee's Second Assignment of Error on cross-appeal is overruled. For the foregoing reasons, the judgment of the Tuscarawas County Court of Common Pleas, Juvenile Division, is hereby affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas, Juvenile Division, Tuscarawas County, Ohio, is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.
GWIN, P.J., and HOFFMAN, J., CONCUR.