The State of Ohio, Appellant, *v.* Watson, Appellee.

[Cite as State v. Watson (1971), 28 Ohio St. 2d 15.]

16

(No. 70-168—Decided October 20, 1971.)

18

*Mr. John T. Corrigan,* prosecuting attorney. *Mr. Harvey R. Monck* and *Mr. Henry Szemer,* for appellant.
*Mr. Edward R. Brown,* for appellee.

CORRIGAN, J. In this appeal by the state we shall first consider the two assignments of error advanced by defendant in the Court of Appeals, upon which that court predicated its reversal of the conviction.

Number one is defendant's contention that the trial court erred in admitting in evidence the details of two other criminal acts allegedly committed by defendant.

Evidence of one of the prior criminal acts was adduced by the testimony of one Peter Ashcroft, a privately employed police officer, that three weeks before the Huber murder he was attacked by two men in his driveway and his gun was taken. At the trial he identified the gun which the arresting officers had found at defendant's feet at the time of arrest as being his. It was also established that Ashcroft's gun was the murder weapon. Another state witness testified that defendant told him that he and one Hickman took the gun "off a policeman."

The other prior criminal act brought out at the trial was in the testimony of one Harold Kelly that, two days before the murder, defendant had attempted to hold him up while he was delivering ice cream in the vicinity of the crime. He identified the gun used in the killing as the one used by defendant in the attempted holdup.

The trial court permitted the foregoing evidence of prior criminal acts to be introduced for the purpose of establishing possession of the murder weapon by defendant. On that issue, the arresting officers testified that the gun was found at defendant's feet at the time of arrest, and defendant himself subsequently testified that he obtained the gun in a prior robbery, admitted that he fired the gun when he saw the police car, and that, when apprehended, he "throwed the gun down."

On the basis that possession of the gun by defendant was sufficiently established by evidence other than the prior criminal acts elicited from witnesses Ashcroft and Kelly, the Court of Appeals found that, "the evidence involving the past acts was totally unnecessary to make the proof of possession the state required." The court then determined that the acts were not admissible under the similar acts statute, R. C. 2945.59; that the effect of the evidence of other crimes "was to provide evidence of 'collateral offenses' as 'substantive evidence of the offense on trial'—a consequence condemned * * * in *Whiteman* v. *State* * * * [119 Ohio St. 285]"; and that the admission of such evidence of prior acts constituted reversible error.

At the outset, it must be observed that when the state is presenting its evidence in chief it must, before it rests, present sufficient evidence so that the court will not direct a verdict for defendant. At the time the state put on its case, including the evidence in respect to the two prior criminal acts, it had no knowledge that defendant himself would take the witness stand and would subsequently admit that he possessed the murder weapon and fired it. At the time this evidence was introduced the state was attempting to connect defendant with the murder weapon through the use of all possible evidence that bore on that subject. Thus, at the time of its admission, such evidence could not be said to be merely cumulative; rather, it was closely connected with proof of possession of the murder weapon by defendant.

Such evidence connecting defendant with the murder weapon was not inadmissible simply because it did not

fall within the exceptions permitting introduction of evidence of prior acts specified in R. C. 2945.59. The state made it crystal clear to the trial court that this evidence showing possession of the murder weapon by defendant was not being presented under favor of that statute. It is an established principle of law that, notwithstanding the general rule that evidence of other criminal acts is not admissible, such "general rule of exclusion does not apply where the evidence of another crime is relevant and tends directly * * * to prove * * * accused's guilt of the crime charged, or to connect him with it, or to prove some particular element or material fact in such crime; and evidence of other offenses may be received if relevant for any purpose other than to show mere propensity or disposition on accused's part to commit the crime." 22A Corpus Juris Secundum 744, Section 683.

Stated another way, the rule is that "except when it shows merely criminal disposition * * * evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged. 'The general tests of the admissibility of evidence in a criminal case are: * * * does it tend logically, naturally, and by reasonable inference to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.'" *People* v. *Peete* (1946), 28 Cal. 2d 306, 314, 169 P. 2d 924.

We repudiate the notion that criminality of conduct offered for some relevant purpose is an obstacle to its reception. As the Supreme Court of Kansas stated in *State* v. *Adams* (1878), 20 Kan. 311, 319: "Whatever testimony tends directly to show the defendant guilty of the crime charged, is competent, although it also tends to show him guilty of another and distinct offense. * * * A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him."

Thus where, as in this case, the state is required to

show possession of the weapon by defendant it is permissible to allow in evidence proof of other crimes tending to prove such possession, even though such evidence involves proof of crimes other than the one with which the defendant is charged. *State* v. *Hudgens* (1967), 102 Ariz. 1, 423 P. 2d 90; *Bray* v. *State* (Okla. 1969), 450 P. 2d 512.

Furthermore, the state of the evidence here as to the charge in the indictment was such that the evidence of prior criminal acts could not possibly have been prejudicial to the defendant. See *Chapman* v. *California* (1967), 386 U. S. 18.

We therefore conclude that the trial court did not err in allowing in evidence the testimony of witnesses Ashcroft and Kelly, and that the judgment of the Court of Appeals must be reversed as to its contra ruling on such evidence.

The second question upon which the Court of Appeals based its reversal relates to the exclusion of certain veniremen because they had opinions which precluded them from joining in a verdict of capital punishment.

Four days were devoted to the selection of this jury, and the jury *voir dire* was participated in by the court, as required by R. C. 2945.27, by the two members of the prosecuting attorney's staff and by the three experienced, seasoned criminal lawyers representing the defendant. The scrupulous care exercised by the able trial judge in the jury selection is manifest upon a careful reading of the 817 pages of the record devoted to the impaneling of the jury of twelve and the seating of two alternate jurors.

It is the unanimous view of this court that a fair and impartial jury of citizens of Ohio was selected and sworn, and discharged their individual duty as jurors in accordance with their juror's oath. The record clearly supports the verdict of the jury that this defendant was guilty of first degree murder.

However, under the law of Ohio, after the jury agrees on the guilt of the defendant in a first degree murder case, they then vote on the question of recommending mercy. In this case, the jury did not recommend mercy. The Su-

preme Court of the United States has held in *Witherspoon* v. *Illinois* (1968), 391 U. S. 510, 20 L. Ed. 2d 776, that (1) a jury from which veniremen have been excused for cause after expressing conscientious scruples against or opposition to capital punishment, without also stating that they would automatically vote against the imposition of such punishment no matter what the trial would reveal, falls short of that impartiality to which petitioner was entitled under the Sixth and Fourteenth Amendments, and under these circumstances the execution of the death sentence would deprive petitioner of his life without due process of law; and (2) this holding has fully retroactive application.

The holding in *Witherspoon* is succinctly stated in headnotes 1 and 8 of 20 L. Ed. 2d 776.

Headnote 1 reads:

"In determining the qualification of a juror in a capital case, it cannot be assumed that a juror who describes himself as having 'conscientious or religious scruples' against the infliction of the death penalty or against its infliction 'in a proper case' thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him; the critical question is not how the phrases employed in this area have been construed by courts and commentators, but how they might be understood—or misunderstood—by prospective jurors, and unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position."

Headnote 8 reads:

"A sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction; no defendant can constitutionally be put to death at the hands of a tribunal so selected."

Following *Witherspoon*, the United States Supreme

24

Court rendered a confirming decision in *Boulden* v. *Holman* (1969), 394 U. S. 478. This latter case involved an Alabama statute (Ala. Code, Section 57, Title 30), which authorizes the exclusion of any potential juror who has a "fixed opinion against capital * * * punishment." The Illinois statute involved in *Witherspoon* (Ill. Rev. Stat., Section 743, Chapter 38) provided:

"In trials for murder it shall be a cause for challenge of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same."

The doctrine first propounded in *Witherspoon* was reiterated in *Maxwell* v. *Bishop* (1970), 398 U. S. 262.

The Ohio statute under scrutiny in this case, R. C. 2945.25, has been operative since 1869 (66 Ohio Laws 287, 307) and has authorized the challenging of a prospective juror for cause where such juror had an opinion which precluded him from voting for a verdict which would result in the death penalty. However, on July 23, 1971, the United States Supreme Court reversed the judgments of this court in *State* v. *Pruett* (1969), 18 Ohio St. 2d 167, and *State* v. *Wigglesworth* (1969), 18 Ohio St. 2d 171, as to imposition of the death penalty. Applying such mandate of the United States Supreme Court as to challenges for cause upon a jury *voir dire* in a capital case, as reflected in *Witherspoon, Boulden* and *Bishop, supra*—which we must follow—we find that one or more of the members of the veniremen discharged in this case did not unambiguously state that he would automatically vote against the imposition of the death penalty in a proper case, or, in other words, no matter what the trial might reveal.

Upon this state of the record, we are constrained to conclude that the judgment of the trial court was erroneous insofar as it imposed the sentence of death.

We turn now to defendant's contention that he was prejudiced by the prosecution's comments in closing argument in respect to matters which had been excluded from evidence during the trial, and in respect to the prosecu-

tion's demand for the death penalty, in the course of which the prosecuting attorney made reference to the fact that one of the prosecutors had not made such a demand in over 40 years of trying cases.

The first of these contentions refers to the fact that during cross-examination of a defense witness, when the state tried to show defendant's connection with certain black militant groups, the witness was asked whether such groups were engaged in instigating riots, to which question the court sustained defendant's objection.

In argument to the jury, the prosecutor stated:

"Ladies and gentlemen, he also made—Mr. Giuliani also made some reference to innuendoes, or snide remarks, or snide questioning on behalf of the prosecution relative to an individual's association with other individuals.

"Ladies and gentlemen, I submit to you motivation is something we are all concerned with. Aren't you? And ask yourselves, aren't you concerned at this time, at this stage of this proceeding, to have answered to your satisfaction what really motivated this man to commit such a heinous act? Heinous crime. Why, certainly. And every one of those questions related to his association with friends, with the concept of those associations, with their participation in that association. I submit to you those are pertinent questions.

"I feel those are questions you, yourself, would have liked to have heard the answers to."

The prosecutor in arguing for the death penalty stated:

"Mr. Harvey Monck has indicated to you that in the course of his 40 years of experience with this office he has never made an overt request for the ultimate penalty, and I, ladies and gentlemen, even in my five years of tenure in this office, I have had a number of first degree murder cases, prosecuted some successfully. Ladies and gentlemen, I also have never made the overt request for the ultimate penalty. I am not saying that perhaps circumstances in those cases were not of such that justified the request. But, ladies and gentlemen, here is one case—here is a

case which every police officer, every law-abiding citizen in our community is looking for you to provide not only example, but also to declare to everyone concerned that we will no longer tolerate this kind of behavior toward law-enforcement officers in our community."

No objection was made by defendant to either of those remarks. In *State* v. *Nevius* (1947), 147 Ohio St. 263, 283, the court, quoting from *Scott* v. *State* (1923), 107 Ohio St. 475, stated: "Improper remarks of counsel for the state during argument, unless so flagrantly improper as to prevent a fair trial, should be at once objected to and exception taken; otherwise error cannot be predicated upon the remarks alleged to have been improper."

We are of the opinion that on the facts presented in this case the questioned remarks were not so flagrantly improper as to have prevented a fair trial. We note that "* * * there is nothing in the record to show that defendant thought the argument was improper at the time, since there was no objection to it." *State* v. *Woodards* (1966), 6 Ohio St. 2d 14, 26.

Defendant's final contention raised in the Court of Appeals is that the trial court erred in refusing to suppress his in-custody statement made to a newspaper reporter without determining whether such statement was influenced by earlier statements made by defendant to the police.

In permitting the newspaper reporter to testify as to defendant's statement made to him in the bullpen, the trial court noted that "no law enforcement officers participated in this particular questioning of the defendant."

Custodial interrogation, as defined in *Miranda* v. *Arizona* (1966), 384 U. S. 436, 444, means "questioning initiated by law enforcement officers after a person has been taken into custody * * *." The *Miranda* requirements "do not apply when admissions otherwise admissible are given to persons who are not officers of the law or their agents." *People* v. *Morehead* (1970), 45 Ill. 2d 326, 259 N. E. 2d 8; *Schaumberg* v. *State* (1967), 83 Nev. 372, 432 P. 2d 500.

Although defendant was in custody, the statement in

question was not the result of "questioning initiated by law enforcement officers." Therefore, it is of no consequence that the statement might have been influenced by earlier statements made by defendant to the police.

The judgment of the Court of Appeals is reversed as to assignment of error number one.

The judgment of the Court of Appeals is affirmed as to assignments of error numbers two, four and five.

The judgment of the Court of Appeals as to assignment of error number three, that the sentence of death cannot be constitutionally justified on the record before us, is affirmed.

The judgment of the Court of Appeals that this cause be remanded for further proceedings according to law is modified and the judgment of the Court of Common Pleas finding the defendant guilty of murder in the first degree is affirmed; however, the judgment of the Court of Common Pleas sentencing the defendant to death is reversed and the cause is remanded to the Court of Common Pleas with instructions to vacate the journal entry sentencing this defendant to death and then to sentence defendant to imprisonment in the Ohio State Penitentiary for life, as provided for in R. C. 2901.01.

*Judgment accordingly.*

O'NEILL, C. J., SCHNEIDER, HERBERT, DUNCAN, STERN and LEACH, JJ., concur.