[Cite as *State v. Foster*, 2011-Ohio-2781.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
## No.   95209

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MICHAEL FOSTER

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-514430

**BEFORE:**   Boyle, P.J., Sweeney, J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:**   June 9, 2011

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
Leader Building
Suite 940
526 Superior Avenue
Cleveland, Ohio   44114


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor
BY:   William Leland
         Thorin O. Freeman
Assistant County Prosecutor
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113


MARY J. BOYLE, P.J.:

{¶ 1}   On August 3, 2001, the Miles Eagle Supermarket ("Miles store") was robbed at gunpoint.   The victim, Anwar Hamed, was shot twice during the course of this robbery, in his shoulder and in his back, and as a result, was rendered a paraplegic.   Hamed died in March

2007. In August 2008, defendant-appellant, Michael Foster (referred to as "Michael" or "Foster"), was indicted on multiple counts relating to the aggravated robbery of the Miles store in 2001 and Hamed's death nearly six years later.

Procedural History and Assigned Errors

{¶ 2} The grand jury indicted Foster on six counts: Count 1, aggravated murder, in violation of R.C. 2903.01(B); Count 2, aggravated murder, in violation of R.C. 2903.01(A); Count 3, aggravated robbery, in violation of R.C. 2911.01(A)(1); Count 4, aggravated robbery, in violation of R.C. 2911.01(A)(3); Count 5, having a weapon while under a disability, in violation of R.C. 2923.13(A)(2); and Count 6, receiving stolen property, in violation of R.C. 2913.51(A). The first four counts also carried one- and three-year firearm specifications, as well as notice of prior conviction and repeat violent offender specifications. Count 5, as well as the notice of prior conviction and repeat violent offender specifications, was tried to the court; the remaining counts and specifications were tried to a jury.

{¶ 3} After an eight day trial, the jury found Foster guilty of the lesser included offense of murder in Count 1, with the firearm specifications, guilty of both counts of aggravated robbery, with the firearm specifications, and guilty of receiving stolen property as charged in Count 6. But the jury found Foster not guilty of aggravated murder as charged in Count 2. The trial court found Foster guilty of having a weapon while under a disability, and guilty of both the notice of prior conviction and repeat violent offender specifications.

{¶ 4} The trial court sentenced Foster to 53 years to life in prison. It merged all of the firearm specifications and sentenced Foster to three years in prison for them, ordering that they be served consecutive to and prior to all other terms. It sentenced him 15 years to life on Count 1. It merged the aggravated robbery convictions and sentenced him 10 years on Count 4, and ordered that it be served consecutive to Count 1. It sentenced him five years on Count 5, and ordered that it also be served consecutively to the other counts. It sentenced him to 12 months on Count 6, but ordered that it be served concurrently to the other counts. The trial court also imposed a 10-year prison term for each of the repeat violent offender specifications in Count 1 and Count 4, and ordered that they be served consecutive to each other and all other counts. The trial court then ordered that Foster's sentence in this case be served concurrently to the sentence he received in another case, where he had received 18 years in prison. The trial court further notified Foster that he would be subject to five years of mandatory postrelease control.

{¶ 5} It is from this judgment that Foster appeals, raising five assignments of error for our review:

{¶ 6} "[1.] The state failed to present sufficient evidence to sustain a conviction against appellant.

{¶ 7} "[2.] Appellant's convictions are against the manifest weight of the evidence.

{¶ 8} "[3.] The trial court erred when it admitted other acts testimony in violation of R.C. 2945.59, Evid.R. 404(B) and appellant's rights under Article I, Section 10 of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution.

{¶ 9} "[4.] The trial court committed reversible error when it failed to give the jury the accomplice testimony instruction.

{¶ 10} "[5.] Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments of the U.S. Constitution."

{¶ 11} We will address Foster's third, fourth, and fifth assignments of error first.

Jury Trial

{¶ 12} The state presented 16 witnesses against Foster. The facts established that on August 3, 2001, at least two men robbed the Miles store at gunpoint, just after it opened. Hamed, whose family owned the business, was shot first in his shoulder and then in his back. As a result, he became paralyzed from the waist down. When police officers arrived on the scene, they found Hamed lying on the floor near the back of the store. Hamed told them that there were four men who robbed the store and the one who shot him was "a black male, about 5'7", ski mask, and ski goggles."

{¶ 13} At the hospital a couple of weeks later, Hamed gave police a statement where he said that it was three men who robbed the store. As for the shooter, Hamed said that "he

came in, he had goggles on, they were clear, I could see him clearly, and shoots me right in the shoulder, I tried to run and he shoots me in the back. I fell on the ground, my gun fell from my waist and I couldn't move no more[.]" Hamed described the shooter's goggles as "clear, maybe safety or motorcycle goggles." Hamed further told police that the shooter demanded Hamed give him the keys to the office, which Hamed did.

{¶ 14} Hamed said the men took his gun, wallet, and credit cards. Police officers also learned from Hamed's brother that 20 cartons of cigarettes were taken, as well as approximately $5,000.

{¶ 15} Detective Joseph Daugenti testified that he was assigned the case on August 4, 2001, the day after Hamed was shot. Detective Daugenti explained that he was aware that James Sheron had been named as a suspect in another aggravated robbery case near the Miles store. Because of this, Detective Daugenti created a photo array with Sheron's picture and showed it to Hamed at the hospital. Detective Daugenti explained that although Hamed had described his shooter as wearing a ski mask, Hamed had told him that he was still able to get a good look at the person who shot him. Detective Daugenti testified that Hamed "immediately without hesitation" chose Sheron as the person who shot him. In Hamed's statement to police, he said that he was "totally positive[,] absolutely positive," that it was Sheron who shot him, and that he had "no doubt."

{¶ 16} Detective Daugenti further testified that as a result of Hamed's identification of Sheron, Sheron was arrested. Detective Daugenti attempted to interrogate Sheron when he was in custody, but Sheron vehemently denied that he did it and became somewhat violent, hitting the table and yelling, so Detective Daugenti ended his interrogation.

{¶ 17} As part of his investigation, Detective Daugenti contacted CitiBank to obtain Hamed's credit card report. He learned that Hamed's credit card had been used three places on the day of the shooting: a Sunoco gas station, the Maple Town Bi-Rite at 12:50 p.m., and a Super K-Mart on Warrensville Center Road at 2:56 p.m. He obtained sales receipts from the Bi-Rite and the K-Mart, matching the times from the credit card report. He further obtained a list of the UPC codes of the items purchased at both stores.

{¶ 18} Detective Daugenti said that after he received the UPC codes of the items purchased with Hamed's credit cards, he obtained consent to search Sheron's home from Sheron's mother. Detective Daugenti was looking for the items purchased at the Bi-Rite or K-Mart. But he was unable to find any evidence.

{¶ 19} Detective Daugenti also obtained videos from K-Mart security cameras. One of the videos shows two black males wearing baseball hats in the check-out line at almost the exact time Hamed's credit card was used.

{¶ 20} Several police officers testified that on September 13, 2001, they responded to a call that an aggravated robbery had taken place at the Greenlite Beverage store ("Greenlite store"). Dispatch further described the vehicle involved as a small blue car and broadcasted the car's license plate number.

{¶ 21} When officers arrived at the store, they found two men who had been handcuffed and robbed. The victims told the officers that two men had come into the store, put handcuffs on them, took their wallets, money from the register, and alcohol.

{¶ 22} Other officers were patrolling the area looking for a car that matched the description. Sergeant Pat Putnam saw a blue car pulling out of the Cleveland Motel. He verified that the plates matched the license plate number that was broadcast over the radio. He followed the vehicle and notified other officers. He lost sight of the vehicle in a residential neighborhood, but other officers soon saw it and stopped it.

{¶ 23} Michael Foster was the sole occupant of the blue car when police stopped it. Police found an identification card and a credit card belonging to one of the robbery victims from the Greenlite store in Michael Foster's pocket. On the back seat of the blue car, police found a black "suitcase-type bag" with two handguns inside the bag, a Taurus .38 revolver and a Smith & Wesson revolver. There were also several hats and various items of clothing in the car. Michael Foster was the registered owner of the blue car.

{¶ 24} Because officers knew that Michael Foster had been at the Cleveland Motel, they went back to it and discovered that his brother, Lamont Foster ("Lamont"), was staying there. Police knocked on Lamont's door. Lamont let them in and cooperated with the officers, letting them in the room to search it.

{¶ 25} In the ceiling tiles of the room, police found two wigs and a Baltimore Ravens baseball hat wrapped up inside a shirt. In the dumpster behind the hotel, officers also found a bag containing a wallet and keys belonging to one of the robbery victims from the Greenlite store.

{¶ 26} On November 6, 2001, Detective Daugenti received a tip that Michael Foster was involved in the Miles store robbery. Michael Foster was already in custody on other charges (relating to the Greenlite store robbery) at that time. Detective Daugenti interviewed Michael and testified that Michael told him that he was involved in the Miles store robbery, but that he was "basically the lookout," and that it was his two brothers who actually robbed the store, Lamont and Gilbert Foster.

{¶ 27} After talking to Michael, Detective Daugenti learned from Gilbert Foster's employer that Gilbert had been at work at the time of the Miles store robbery. Detective Daugenti then attempted to speak with Lamont, who was also in custody at that time (for the Greenlite store robbery), but Lamont would not talk to him.

{¶ 28} Detective Daugenti interviewed Michael again in late November 2001. At that time, Michael agreed to give him a written statement regarding the Miles store robbery. Michael told Detective Daugenti that Lamont and Gilbert came to his house and wanted to use his car, but did not tell him why. Lamont then secretly told Michael that he and Gilbert were going to rob the Miles store. Michael said that Lamont and Gilbert then left his house and Michael followed them. Michael "took the railroad tracks," and "sat right across the street from the supermarket on the tracks." Michael stated, "[Lamont] went into the back door and Gilbert went in the front so I started walking across the street. At first I did not think they were going to do it. I saw [Hamed]. Looked like he was near the back door when he started running. He was screaming, then [Lamont] was chasing behind him and started shooting."

{¶ 29} Michael further told Detective Daugenti that "[Lamont] shot twice and Gil was already inside the store. They had to be standing over him. You could hear [Hamed] yelling in Arabic language then Gil grabbed [Lamont.] From what I found out later, [Lamont] was going to shoot [Hamed] in the head because [Hamed] was talking in Arabic and was not telling him where the money was. Gil grabbed the keys from [Lamont] and went *** to the check cashing booth. He was up there for a minute and came

—11—

back with some stuff. [Lamont] was at the register taking money out of the register. That is when I went back to my house. That is all I seen at that point."

{¶ 30} Detective Daugenti testified that Michael also told him that he knew Lamont took a .38 caliber gun from Hamed and that Lamont shot Hamed with a .38, but Michael said he did not know what happened to the gun. Michael further told Detective Daugenti that after the robbery, Lamont and Gil were laughing about shooting Hamed because he was "screaming in his native tongue." Michael also knew that Lamont and Gil took "cash, some cigarettes and coins, a bunch of rolled up coins," from the Miles store.

{¶ 31} Detective Daugenti later learned that Michael lived with Angelica Weaver around the time of the Miles store robbery. Weaver admitted that Michael had lived with her, and she gave Detective Daugenti consent to search her home. Detective Daugenti found several items in the home with UPC codes that matched UPC codes on items purchased with Hamed's credit card on August 3, 2001 at the Bi-Rite and K-Mart, including a bottle of Heinz ketchup, empty bottles of Scope, Folgers coffee, deodorant, Quaker grits, three packages of frozen meat, razors, and three packages of boxer briefs.

{¶ 32} Lamont testified that he agreed to testify against his brother, Michael, in exchange for being charged with involuntary manslaughter for

the death of Anwar Hamed. In exchange, Lamont would not receive additional prison time for the conviction.

{¶ 33} Lamont testified that on August 2, 2001, Michael called him and said that he wanted to rob the Miles store. Lamont said that he did "not want to rob that one because it's the next street away from [his] mother's house and sometimes she asked [him] to go to that store." But Lamont later agreed to rob the Miles store.

{¶ 34} The following morning, Lamont explained that he went to Angie's house, where Michael was staying. Michael gave him the "bowling bag" that they "kept the guns in." They had two .38 revolvers. They both had gloves, wigs, and handcuffs. They drove to the Miles store in Michael's blue car.

{¶ 35} They went inside the store and Hamed was standing in the aisle. They told Hamed to put his hands in the air, while pointing their guns at him. Hamed complied with the order at first, but then began yelling in Arabic and dropped his hands. When Hamed dropped his hands, Lamont said that he "heard a shot from behind [him]." Hamed fell to the ground and Lamont said that he saw Michael walk up to Hamed and shoot him again.

{¶ 36} Lamont testified that he proceeded to remove money from the cash register. Michael took a gun and keys from Hamed, and he opened the cash-checking "booth" where they believed they would find more cash. While

Michael was in the cash-checking booth, Lamont watched the front door. They were only able to get $40 from the cash-checking booth. They then left the store.

{¶ 37} After the robbery, Lamont stated that he gave his gun back to Michael because Michael was the one who wiped the guns down and stored them in the bowling bag. Lamont testified that Michael would collect the guns "every time after we would do something."

{¶ 38} Lamont said he learned that Michael also took Hamed's credit card because Michael later used the card to purchase food and other items. Lamont said he was mad because he had used his own money to purchase food.

{¶ 39} Lamont testified that he was arrested for the Greenlite store robbery in September 2001 at the Cleveland Motel. Lamont explained that Michael had just dropped him off before the police arrived at his room. Lamont thought that the police might show up at his room because he heard police sirens and tires screech and figured that Michael had been arrested. Lamont said he could not leave because there was a police car in the parking lot. Lamont hid money and liquor in the ceiling tile of the room. Lamont also shaved because he was trying to change his appearance so that he could "make a get away."

{¶ 40} Lamont identified a .38 Taurus Special that he said Michael "took from the Citgo gas station," that the two of them had robbed on August 24, 2001.[1] The state played a video for the jury from the robbery at the Citgo gas station. Lamont identified himself and Michael in the video. They were both wearing baseball hats. Lamont explained that it was he who walked in first and pulled a gun, and Michael walked in second, carrying the black bowling-ball bag. Lamont said he also handcuffed the clerk at the Citgo. Lamont testified that he pleaded guilty "to the Citgo robbery."

{¶ 41} Lamont pleaded guilty to attempted murder, aggravated robbery, and felonious assault with gun specifications for the robbery at the Miles store. He had been in prison since February 2002 for these crimes. He had never been charged with the death of Anwar Hamed, and as of the day he testified, there were no pending charges against him relating to the death of Hamed.

{¶ 42} Dan Galita, M.D., forensic pathologist and deputy coroner, testified that Anwar Hamed died on March 21, 2007, at 12:27 a.m. Dr. Galita performed an autopsy on Hamed on March 22, about 33 hours after Hamed had passed away. He explained that Hamed had five Fentanyl

---

[1] It was Detective Daugenti who testified to the type and brand of gun, as well as the date the Citgo gas station was robbed.

patches on his back that were 100 micrograms per hour patches.[2]  Hamed had severe coronary atherosclerosis (hardening of the arteries), and a severe infection in both lungs, or acute bronchopneumonia.  Dr. Galita explained that he recovered a bullet from Hamed's left lung.

{¶ 43} Hamed's toxicology report showed that he had the following in his system: Amitriptyline, Bupropion, and Citalopram, which are all antidepressants; Diazepam, which is a sedative; Nortriptyline, an antidepressant; and Fentanyl, which is a narcotic pain killer.  Dr. Galita testified that Hamed had 73 nanograms per milliliter of Fentanyl in his system, which he described as "very high."  But Dr. Galita explained that the number was "abnormally artificially high" because Hamed's body continued to absorb Fentanyl through the patch for up to 12 hours after his death, but the drug was not metabolized.

{¶ 44} Dr. Galita ruled out Fentanyl overdose because there was nothing in Hamed's medical records to indicate that he had "wooden chest syndrome."  He explained that when people overdose on drugs, their chests become very stiff and their breathing becomes very shallow, short, and slow.  Dr. Galita said that Hamed's medical records indicated that when he arrived at the

---

[2]Hamed's physician, Dr. Douglas Vanauken, testified that in the fall of 2006, he began prescribing Hamed two Fentanyl patches every three days.

hospital, he had hyperventilation because his breathing was very deep and very rapid. This was "typical for an individual who has a lung infection and doesn't have enough oxygenation because of the infection in the lungs."

**{¶ 45}** Dr. Galita explained that people who are paralyzed are "predisposed" to lung infections. He said that is why patients who have surgery are immediately mobilized, to prevent lung infections and blood clots. He further explained that when a patient has a severe lung infection, oxygen cannot get to the blood because of the infection in the lungs and then the organs are deprived of oxygen. The patient dies from lack of oxygen.

**{¶ 46}** Dr. Galita testified that because Hamed was paralyzed from the waist down, he developed a lung infection from being bedridden and wheelchair ridden for a long period of time. Dr. Galita concluded that "the cause of death was acute bronchopneumonia due to paraplegia, due to remote gun shot wound of lumbar spine with spinal cord injury, and the manner of death was ruled as a homicide while at work."

**{¶ 47}** The bullet that Dr. Galita removed from Hamed was tested in the police department's forensic lab. The bullet matched a test-fired bullet from the Smith & Wesson .38 revolver that was found in the black bowling bag in the back of Michael Foster's vehicle on September 13, 2001.

{¶ 48} Michael Foster presented Dr. Robert Bux, M.D., to testify for him. Dr. Bux testified that he is a physician, a board certified anatomical clinical and forensic pathologist, and the elected coroner in El Paso County, Colorado. He testified that he coauthored an article on Fentanyl overdoses that was in the process of being published.

{¶ 49} Dr. Bux testified that because Hamed's spinal injury was in the lower back, causing him to be paralyzed from the waist down, it would not affect his respiratory system. Dr. Bux explained that "Fentanyl is a very, very potent narcotic" that is "many times more powerful than morphine." He found the level of Fentanyl in Hamed's blood to be "an extremely high lethal dose." He explained that it was the second highest dose he had ever seen. He explained that even if a person had a high tolerance to Fentanyl, he would expect the range to be "five to maybe seven, maybe eight, but certainly no higher than that." He opined that Hamed's cause of death was "due to massive drug overdose and pneumonia, *** independent of the gunshot wound."

<u>Other Acts Evidence</u>

{¶ 50} In his third assignment of error, Foster contends that the trial court erred when it permitted the state to elicit other acts evidence regarding the robbery at the Greenlite store in September 2001. We disagree.

**{¶ 51}** The standard of review regarding the admissibility of any such evidence is abuse of discretion. *State v. Sanford*, 8th Dist. No. 84478, 2005-Ohio-1009, ¶10, citing *State v. Montgomery* (1991), 61 Ohio St.3d 410, 575 N.E.2d 167.

**{¶ 52}** Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The listed exceptions within Evid.R. 404(B) are not exclusive, and other acts evidence not fitting within the enumerated categories may be admissible so long as the evidence is admitted for any proper purpose other than proving the defendant's propensity to act and conformity with a particular trait of his character. *State v. Smith* (1990), 49 Ohio St.3d 137, 140, 551 N.E.2d 190.

**{¶ 53}** Moreover, Evid.R. 404(B), by its very terms, "excludes only extrinsic evidence — 'evidence of other crimes, wrongs, or acts' — whose probative value exclusively depends upon a forbidden inference of criminal propensity." *U.S. v. Manning* (C.A.1, 1996), 79 F.3d 212, 218, cert. denied, (1996), 519 U.S. 853, 117 S.Ct. 147, 136 L.Ed.2d 93. Thus, "[e]vidence intrinsic to the crime for which the defendant is on trial *** is not governed

by Rule 404(b)." Id. (discussing the federal rule, which is nearly identical to the Ohio rule).

**{¶ 54}** In *State v. Watson* (1971), 28 Ohio St.2d 15, 275 N.E.2d 153, the Ohio Supreme Court reviewed the admissibility of other acts evidence involving a defendant being seen with a gun. The court stated that the "'general rule of exclusion does not apply where the evidence of another crime is relevant and tends *directly* *** to prove *** [the] accused's guilt of the crime charged, or to connect him with it, or to prove some particular element or material fact in such crime; and evidence of other offenses may be received if relevant for any purpose other than to show mere propensity or disposition on [an] accused's part to commit the crime.'" (Emphasis added.) Id. at 21, quoting 22A Corpus Juris Secundum (1962), Criminal Law, Section 683.

**{¶ 55}** The Supreme Court went on to say: "Stated another way, the rule is that 'except when it shows merely criminal disposition, *** evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged.'" Id. at 21, quoting *People v. Peete* (1946), 28 Cal.2d 306, 314, 169 P.2d 924.

**{¶ 56}** In *Watson*, the court concluded that the other acts evidence was admissible when it showed that the defendant had possession of the murder weapon used in the crime charged. One witness testified that three weeks

before the murder in question, the defendant stole the witness's gun. It was established that this gun, which was found at the defendant's feet at the time of his arrest, was the murder weapon. Additionally, a second witness testified that two days before the murder, the defendant had attempted to rob him with a gun. The witness identified this gun, and it was shown to be the weapon used in the subsequent murder. Id. at 19.

**{¶ 57}** The evidence introduced here regarding the Greenlite robbery was not introduced to provide "a forbidden inference of criminal propensity." That is, it was not introduced to prove that Foster was a bad person, or to establish that because he committed the Greenlite store robbery, he must have committed the Miles store robbery. The evidence of the Greenlite robbery was offered to directly connect Foster to the Miles store robbery and shooting of Hamed — and to prove Foster's guilt of the crimes charged, namely, aggravated robbery and murder. Specifically, the .38 revolver found in the back seat of Foster's car when he was apprehended after the Greenlite robbery turned out to be the exact gun that was used to shoot Hamed and, thus, was *direct evidence* of the crimes for which Foster was being tried.

**{¶ 58}** Accordingly, we overrule Foster's third assignment of error.

Jury Instruction on Accomplice Testimony

{¶ 59} In his fourth assignment of error, Foster argues that the trial court committed reversible error when it failed to give the jury a cautionary instruction regarding Lamont's testimony as an accomplice under R.C. 2923.03. We disagree.

{¶ 60} Foster concedes he did not object to this evidence and, thus, he argues that it amounted to plain error. Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. Plain error does not exist unless the appellant establishes that the outcome of the trial clearly would have been different but for the trial court's allegedly improper actions. *State v. Waddell*, 75 Ohio St.3d 163, 166, 1996-Ohio-100, 661 N.E.2d 1043. Under the plain error doctrine, a trial court's decision will be reversed only in exceptional circumstances to prevent a miscarriage of justice. *State v. Cooperrider* (1983), 4 Ohio St.3d 226, 227, 448 N.E.2d 452.

{¶ 61} R.C. 2923.03(D) provides: "If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

{¶ 62} "The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

{¶ 63} "It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

{¶ 64} This court has previously found the failure to give the accomplice instruction to be harmless error where defense counsel failed to request the instruction in the trial court and significant other evidence introduced at trial supported the defendant's conviction. See *Cleveland Hts. v. Riley* (May 20, 1999), 8th Dist. No. 74101; *State v. Cardwell* (Sept. 2, 1999), 8th Dist. Nos. 74496, 74497, and 74498.

{¶ 65} We find that to be the case here. Even without Lamont's testimony, there was overwhelming evidence to convict Michael. Months after the Miles store robbery, police found several items in Michael's house that were purchased with Hamed's credit card on the day he was shot. Hamed told police that his shooter had taken his credit card out of his wallet. Police obtained sales receipts from two stores where Hamed's credit card was used that contained UPC codes of the items purchased; many of these exact items were found in Michael's house. UPC codes on products are similar to fingerprints on people. Further, when police apprehended Michael after the Greenlite robbery, two guns were found in the back of his car — one of which was later determined to be the gun that was used to shoot Hamed during the Miles store robbery.

{¶ 66} Accordingly, Foster's fourth assignment of error is overruled.

## Ineffective Assistance of Counsel

{¶ 67} In his fifth assignment of error, Foster maintains that his trial counsel was ineffective for failing to request the accomplice jury instruction. We disagree.

{¶ 68} In *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, the Supreme Court of the United States set forth the two-pronged test for ineffective assistance of counsel. It requires that the defendant show (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. The first prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. The second prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable." Id.

{¶ 69} Again, we find that based on the second prong, even if Foster's counsel should have requested the jury instruction, any error did not prejudice Foster's case since there was overwhelming evidence to convict him.

## Sufficiency and Manifest Weight of the Evidence

{¶ 70} In his first assignment of error, Foster argues that the evidence presented at trial was not sufficient to convict him. But all of the arguments that Foster raises go to manifest weight of the evidence, his second assignment of error, not sufficiency.

{¶ 71} In reviewing a claim challenging the manifest weight of the evidence, "[t]he question to be answered is whether there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Internal quotes and citations omitted.) *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶81.

{¶ 72} Foster argues that the state's "star witness" — his brother, Lamont — was "definitely an incredible witness" because he was mentally ill, and had motive to testify against Michael because the state had offered him a deal where he could plead guilty to involuntary manslaughter for Hamed's death, but would not receive any more prison time for it. First, Lamont may have been mentally ill, but the court found Lamont competent to testify. And as for Lamont having motive to testify against Michael, we agree that is true. The jury, however, was fully aware of the plea deal that Lamont had received.

{¶ 73} Further, as we previously stated, Lamont may have been a "star witness," but there was plenty of other evidence presented to the jury to find Michael guilty of the crimes, even without Lamont's testimony.

{¶ 74} Michael also argues that the jury lost its way when it believed the state's witness— the deputy coroner —  over his expert on the cause of Hamed's death.  We cannot agree.  Both doctors were highly qualified and presented differing theories on the cause of death.  We cannot say that the jury lost its way when it believed Dr. Galita over Dr. Bux.

{¶ 75} Finally, Michael maintains that "attempting to link" him to the shooting was inconsistent with the evidence because Hamed had identified James Sheron as the person who shot him.  While true, the jury also heard overwhelming evidence that it was Michael who shot Hamed.  Michael put himself at the scene, although he tried to blame his two brothers — one of whom was at work.  It was Michael who purchased items with Hamed's credit card.  And it was Michael who was found with the gun that shot Hamed.

{¶ 76} Accordingly, after reviewing the entire record, we conclude that this case is not the "exceptional case in which the evidence weighs heavily against the conviction."  *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

**{¶ 77}** Foster's first and second assignments of error are overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

JAMES J. SWEENEY, J., and
SEAN C. GALLAGHER, J., CONCUR