[Cite as *State v. Dennis*, 2022-Ohio-2888.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29266 |
| | : | |
| v. | : | Trial Court Case No. 2020-CR-2185 |
| | : | |
| EMANUEL DENNIS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of August, 2022.

. . . . . . . . . .

MATHIAS H. HECK, JR. by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

CRAIG M. JAQUITH, Atty. Reg. No. 0052997, Office of the Ohio Public Defender, Assistant State Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Defendant-Appellant Emanuel Dennis appeals from his convictions of murder and tampering with evidence; he was sentenced to 16 years to life in prison. For the reasons that follow, the judgment of the trial court will be affirmed.

## I.        Facts and Procedural History

{¶ 2} In the early morning hours of July 25, 2020, Dennis (aka "G") and his long-time friend, Akima Williams, were leaving the parking lot of Sugar's Restaurant and Lounge in Williams's Chrysler 200 when she backed into the red Chevy Caprice driven by John Reece. Both Dennis and Williams admitted to being intoxicated and smoking marijuana in the car before pulling out. Reece exited his vehicle and approached Williams on the driver's side of her car, and an argument ensued. What happened next was disputed at trial.

{¶ 3} Dennis testified that Williams and Reece got into a fierce argument and that Williams called Reece both an "ass" and a "clown." Dennis told the jury, however, that he was not concentrating on the argument because he was focused on rolling a "blunt" and because he thought Williams could hold her own. He testified that he then heard what sounded like a firecracker, and the next thing he knew, Williams had fled, leaving him alone in the car. Seeing Reece lying on the ground, Dennis panicked, switched seats, and drove off.

{¶ 4} On the other hand, Williams told the jury that it was Dennis who got into the argument with Reece, and after it got extremely heated, she became scared, exited the car, and ran away. Williams further testified that while she did not see or hear a gunshot, she did observe a small handgun in Dennis's possession that night.

**{¶ 5}** A third version of the events was revealed by security camera footage of the parking lot. The video showed Williams's car backing out of a parking space and into the rear end of Reece's red Chevy. Reece then exited his vehicle and approached the driver's side of Williams's Chrysler. In the video, a short time later, Williams exited her car from the driver's side and sprinted away. A few seconds after that, a flash was visible in the passenger side window of Williams's car before it sped away from the parking lot. With the car out of the picture, Reece was seen lying on the ground, where bystanders tended to him.

**{¶ 6}** First responders arrived quickly, but Reece could not be saved. An autopsy determined that a .25 caliber bullet entered Reece's left upper chest, went through his left lung, and came to rest in his thoracic spine. Having hit the pulmonary vein (which is a major blood vessel in the lung), massive internal bleeding occurred, and the coroner concluded that Reece had only been able to survive a matter of minutes. Importantly, though, while he was conscious and able to speak, Reece declared to good Samaritans Deonta Brown and Colby Curry "that n***** G shot me." Trial Tr. at 225, 231, 275.

**{¶ 7}** After talking to witnesses on the scene, police quickly zeroed in on Dennis as the suspect. He was located later that night near his mother's house on Grafton Avenue in Dayton, wearing different clothes and with the Chrysler's keys in his hands. A search warrant was soon issued for the residence (which he shared with his mom), and investigators discovered that the clothing - including his shoes - he wore that night to the bar were in the washing machine, still wet.

**{¶ 8}** On July 30, 2020, Dennis was charged in an eight-count indictment: Count 1

– murder (felonious assault: serious harm); Count 2 – felonious assault (serious harm); Count 3 – murder (felonious assault: deadly weapon); Count 4 – felonious assault (deadly weapon); Count 5 – having weapon under disability; Count 6 – tampering with evidence (car keys); Count 7 – tampering with evidence (clothing); Count 8 – tampering with evidence (gun). The murder and felonious assault counts included firearm specifications.

{¶ 9} Before trial, Dennis filed an unsuccessful suppression motion and two motions in limine. Relevant to this appeal, one motion in limine attempted to exclude testimony from a security guard who claimed he saw Dennis with a .25 caliber pistol the night before the shooting. The trial court held that it would permit the testimony for the limited purpose of proving identity.

{¶ 10} The case proceeded to trial on April 12, 2021. The State presented 15 witnesses including eyewitnesses Williams, Brown, and Curry, a Sugar's security guard, law enforcement officers, the coroner, and others. Additionally, the State submitted 58 exhibits for the jury to consider. Dennis testified on his own behalf and made two Crim.R. 29 motions, which were overruled by the court.

{¶ 11} After the four-day trial, Dennis was found guilty of Count 1 (murder: felonious assault serious physical harm) and Count 7 (tampering with evidence: clothes) only. He was sentenced to 15 years to life on the murder conviction and a consecutive 12 months for tampering, for a total of 16 years to life in prison. He was also ordered to pay $12,943.75 in restitution for funeral expenses.

{¶ 12} Dennis has filed a timely appeal with three assignments of error. We will address them in a manner that will facilitate our analysis.

## II.     Manifest Weight

{¶ 13} We will first address Dennis's second assignment of error, which argues that his conviction for murder was against the manifest weight of the evidence. We disagree.

{¶ 14} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  A case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs *heavily* against the conviction.'"  (Emphasis added.)   *Id.* In the case at bar, the jury heard ample evidence that demonstrated Dennis was Reece's killer.

{¶ 15} The jury heard testimony from Akima Williams, the driver of the car that bumped into Reece in the parking lot of Sugar's. She testified that after she contacted Reece's car, she pulled up slightly so she could check out the damage and then give him her insurance information. Instead, "the man came over to the [driver's] side of the car and he was screaming, and then G [Dennis] started saying stuff, and they both got into a screaming match." Trial Tr. at 132. Williams stated she thought the men were going to get into a fist fight, so fearing for her safety, she got out of the car and ran. She further

testified that while she never saw Dennis point a gun at Reece and did not see him fire one, she did see a small, dark colored gun concealed in his pants that night, including while in her car. Trial Tr. at 135-136, 138.

{¶ 16} There was also testimony at trial from Deonta Brown and Colby Curry, employees at Sugar's. They both testified that after closing that night, they walked out of the bar and heard a gunshot. Brown then recounted that "Akima comes running * * * around the building saying, 'oh my God, I can't believe you just shot him. Oh my God. Oh my God. Oh my God.' " Trial Tr. at 224. Similarly, Curry told the jury that he saw a girl running and frantically screaming "He shot him. He shot him." Trial Tr. at 267, 278. Brown also testified that after seeing Williams run by, a car came flying out of the parking lot. She specifically identified Dennis as the driver of that car. Trial Tr. at 224.

{¶ 17} Both Brown and Curry recounted that after the car sped out of the parking lot, they went over to check on Reece. Curry testified that when he got to Reece, he was still conscious and able to talk, and both witnesses stated that Reece told them "That n***** G shot me." Trial Tr. at 225, 247, 273, 275. According to Curry's testimony, though, soon after making the declaration, Reece's condition worsened; he began bleeding from the mouth and soon died.

{¶ 18} Brown also testified that after the shooting, while employees were waiting back inside the bar, she overheard a phone call received by Latonya Clark ("Tootie") from a voice she recognized as Dennis's. According to Brown, Dennis told Clark that he shot somebody, and he might be dead; when Clark confirmed that he was, Dennis hung up. Trial Tr. at 236.

{¶ 19} Richard White, a security guard at Sugar's on July 25, 2020, also contributed testimony that militated against Dennis. He testified that the week of the shooting, he observed (from only a few feet away) a female security guard named "Tootie" pass Dennis a gun while inside the bar. Trial Tr. at 318, 340. He further described the gun as being a pocket-sized .25 caliber weapon and "greyish black" in color. Trial Tr. at 320-321, 341. Additionally, White told the jury that he patted Dennis down upon re-entry into the bar on the night of the shooting, and while he did not locate a weapon, "he gave me a lot of resistance. He got mad at me." Trial Tr. at 325. On cross-examination, White explained it as: "I was patting him down, but you know, he was acting all radical like he didn't want me touching him and stuff." Trial Tr. at 336.

{¶ 20} Dayton Police Officer Ronald Christoffers (now retired) testified that he collected evidence at Dennis's home pursuant to a search warrant. Of note, he stated that he collected recently-washed clothing, including shoes, from a washing machine in the basement. He told the jury that washing clothes hinders DNA collection and washes away gun powder residue. The jury could have reasonably found that Dennis came home and immediately washed his clothes to hide or destroy evidence.

{¶ 21} Dennis, however, argues that the testimony against him was incredible. First, he claims that Williams's testimony should be discounted because as the only other person close to the shooting scene, and possibly a suspect, she had reason to implicate someone else as the shooter. This theory is unavailing because the surveillance video of the event clearly shows Williams running away from the car before the shooting.

{¶ 22} Dennis next argues that because Brown and Curry did not immediately

inform investigators of Reece's dying declaration that "G" shot him (though that fact is disputed by both Brown and Curry), "there is a considerable likelihood that their false claims were fabricated to try to protect Akima Williams." Appellant's Brief at 16. That theory, though, is belied by the evidence; both witnesses testified that they did not even know Williams's name at the time of the shooting. Trial Tr. at 247, 267.

{¶ 23} He also attempts to cast doubt on Brown's testimony that she overheard a phone call in which Dennis ostensibly admitted guilt. His strongest argument in this regard is that Brown should not have been trusted because she apparently did not tell investigators this information, as Detective Geiger testified that he heard the claim for the first time at trial. The State counters, however, that while Brown admitted she did not reveal the phone call until trial, she explained that she thought "Tootie" (to whom the call had been made) had already told investigators. Trial Tr. at 243. Regardless of how unbelievable Dennis thinks this testimony was, it was the province of the jury to evaluate Brown's credibility. "In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented." *State v. Greenlee*, 2d Dist. Montgomery No. 28588, 2020-Ohio-4764, ¶ 21. While we cannot know exactly the jury's conclusions on this issue, "we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." *Id.*

{¶ 24} Viewed as a whole, the weight of the evidence presented allowed a reasonable juror to convict Dennis. The jury did not lose its way, and this is not an exceptional case in which the evidence weighed heavily against the conviction. The

second assignment of error is overruled.

### III. Testimony and Evidentiary Issues

{¶ 25} In his first assignment of error, Dennis asserts that the trial court abused its discretion when it permitted testimony that he had previously been seen at Sugar's with a gun. In a pretrial motion in limine, Dennis sought to prohibit evidence that, on a prior occasion, he had been seen with a .25 caliber gun. The trial court preliminarily overruled the motion, and then at trial, during the testimony of security guard Richard White (that he had seen Dennis with a .25 caliber handgun the week of the shooting), Dennis renewed the objection. After a sidebar (at which the State mentioned that White *may* have initially claimed he was unsure of whether the gun was a .22 or a .25 and that he had seen Dennis with it the night before the shooting), the trial court decided to allow the testimony, but opted to keep it very limited and focused: White could only state that he saw Dennis with a gun the night before the shooting. Both parties seem to agree that the trial court permitted the evidence under Evid.R. 404(B)'s identity exception, although the trial court did not explicitly say so. The question before us now is whether the testimony was properly admitted.

{¶ 26} A trial court has broad discretion to admit or exclude evidence, and its exercise of that discretion will not be disturbed on appeal absent an abuse of discretion. *State v. Hunt*, 2d Dist. Darke No. 2018-CA-9, 2019-Ohio-2352, ¶ 27. A trial court abuses its discretion if it makes an unreasonable, unconscionable, or arbitrary decision. *Id.*

{¶ 27} When engaging in this gatekeeper capacity with respect to the admission

of evidence, the trial court must determine if potential evidence is relevant. To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Evid.R. 401. In other words, there must be some probative value to the evidence. Generally, relevant evidence is admissible. Evid.R. 402. However, even if evidence is relevant, it can become inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury. Evid.R. 403(A).

{¶ 28} "A hallmark of the American criminal justice system is the principle that proof that the accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime." *State v. Curry*, 43 Ohio St.2d 66, 68, 330 N.E.2d 720 (1975), citing 1 *Underhill's Criminal Evidence*, Section 205, 595 (6th Ed.1973). Evid.R. 404 is the embodiment of that principle.

{¶ 29} Evid.R. 404(A) states: "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." In other words, it does not necessarily follow that because a person performed an act in the past, he or she committed *this* act.

{¶ 30} As with many things in the law, however, there are exceptions. Evid.R. 404(B) provides that "other acts" or "propensity" evidence is sometimes admissible for other purposes such as proof of motive, opportunity, preparation, plan, intent, absence of mistake, identity, or knowledge. Evid.R. 404(B). "The key is that the evidence must prove

something other than the defendant's disposition to commit certain acts. Thus, while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22.

{¶ 31} As mentioned above, the State believes the testimony that Dennis was spotted with the dark-colored .25 caliber handgun at the bar the week of the shooting was properly admitted evidence of identity under Evid.R. 404(B). Meanwhile, Dennis argues that because the State did not definitively prove that the weapon he allegedly had the week of the shooting was the identical firearm he allegedly had the night of the shooting, it only demonstrated propensity, which is the kind of evidence Evid.R. 404(B) was designed to prohibit.

{¶ 32} Ohio courts have reviewed this issue. In *State v. Watson*, 28 Ohio St.2d 15, 275 N.E.2d 153 (1971), the court concluded that "other acts" evidence was properly admitted when it demonstrated that the defendant previously had possession of the murder weapon. The *Watson* Court stated, "the rule is that except when it shows merely criminal disposition, * * * evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged." (Citations omitted.) *Id.* at 21. *See also State v. Laws*, 10th Dist. Franklin No. 72AP-398, 1980 WL 353796, * 3 (Nov. 20, 1980) (testimony that defendant robbed another person of what turned out to be the murder weapon was proper evidence to connect the defendant and the murder weapon). Additionally, testimony that a defendant was seen with a gun – not necessarily even the

gun involved in the offense – has been held to be admissible when the sighting had spatial and temporal proximity to the crime in question. *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 75, citing *State v. Crosby*, 186 Ohio App.3d 453, 2010-Ohio-1584, 928 N.E.2d 795, ¶ 13 (8th Dist.).

{¶ 33} Here, White testified that the week of the shooting, he, from only a few feet away, witnessed Dennis get handed a dark colored .25 caliber handgun inside Sugar's bar. That sighting, whether it was one or six days prior, was both temporally and spatially proximate to Reece's murder. Further, because the identity of the killer was in question – Dennis pointed to Williams as the shooter – the evidence was especially relevant; it was needed to establish the identity of the shooter.

{¶ 34} While the evidence was properly admitted, the trial court took an additional step to safeguard Dennis, giving the jury a limiting instruction that the evidence was only for the narrow purpose of deciding identity and that it could not be considered to prove Dennis's character and his conformity therewith. Trial Tr. 749.

{¶ 35} Because the identity of the shooter was in question, we conclude that the trial court's decision to admit the evidence that Dennis had been seen in close temporal and spatial proximity to the murder with a .25 caliber firearm was not an abuse of discretion and that Evid.R. 404(B) was the proper vehicle for admittance. Dennis's first assignment of error is overruled.

IV.    **Ineffective Assistance of Counsel**

{¶ 36}   In his third and final assignment of error, Dennis avers that his trial attorney rendered ineffective assistance of counsel in violation of his constitutional rights.

{¶ 37} To prevail on an ineffective assistance of counsel claim, Dennis must prove that his attorney was ineffective under the standard test from *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The test has two parts. First, the defendant must show that counsel's performance was deficient. *Id.* at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Id.*

{¶ 38} As to the first prong, much deference is given to trial counsel. "[A] court must indulge in a strong presumption that the challenged action might be considered sound trial strategy. Thus, judicial scrutiny of counsel's performance must be highly deferential." *State v. Bird*, 81 Ohio St.3d 582, 585, 692 N.E. 2d 1013 (1998). If the first prong is met, then "prejudice" may be considered. To demonstrate prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1998), first paragraph of the syllabus.

{¶ 39} Here, Dennis argues that his attorney was ineffective because he failed to object to jury instructions regarding causation, specifically to the phrase "failure to act." He alleges that the phrase "failure to act" could have misled the jury into believing that that "Mr. Dennis was responsible for Mr. Reece's death because he failed to act to stop Ms. Williams from shooting Mr. Reece." Appellant's Brief at 20. The State, on the other hand, contends that the instruction provided by the court was a correct statement of law and taken nearly verbatim from the Ohio Jury Instructions ("OJI").

{¶ 40} We recently addressed a similar issue in *State v. Hatfield*, 2d Dist. Montgomery No. 28990, 2022-Ohio-148. In *Hatfield*, the trial court gave the standard instruction on cause as set forth in the OJI, which included the phrase "[c]ause is an act *or failure to act* which, in a natural, continuous sequence directly produces physical injury to a person and without which it would not have occurred." (Emphasis added.) We held that the phrase "failure to act," if it was error at all, was only harmless error where there was evidence before the jury that the defendant had committed an overt act. *Hatfield* at ¶ 125. Further, we determined that the jury instructions, when viewed as a whole, were correct statements of law and that the inclusion of the "failure to act" language was merely superfluous. *Id.* at ¶ 128. *See State v. Taylor*, 78 Ohio St.3d 15, 29, 676 N.E.2d 82 (1997) (a single jury instruction must be viewed within the context of the entire set, not in isolation).

{¶ 41} Here, like in *Hatfield*, the jury instructions were taken (almost word for word) from the OJI, and the "failure to act" language in the instructions was, taken in context of the entire set of instructions, simply superfluous. In addition, the State presented ample evidence that Dennis had indeed been the shooter, further eroding the impact of "failure to act." Dennis's attorney *may* have been successful if he had requested the removal of the superfluous language, but we do not consider it a breach of professionalism that he did not, and it certainly does not rise to the level needed to meet *Strickland*'s first prong: that counsel made errors so serious that he was not even functioning as the "counsel" guaranteed by the Sixth Amendment.

{¶ 42} Dennis's third assignment of error is overruled.

**V.     Conclusion**

**{¶ 43}** Having overruled all the assignments of error, the judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. concurring:

**{¶ 44}** I disagree with the lead opinion's resolution of the first assignment of error.

**{¶ 45}** Critical to the Evid.R. 404(B) analysis is whether or not White's testimony regarding seeing Dennis with a gun on a prior occasion had a temporal and spatial proximity to the homicide in question.

**{¶ 46}** The majority concludes this pre-condition was met, noting, "Whether it was one day or six days prior, it was both temporally and spatially proximate to Reece's murder."   The prosecutor argued and suggested in his questions that this observation of Dennis with the gun was the night before the murder, but White specifically testified as follows:

> Q.   And so the night before, I've kind of switched gears on you a little bit.
>
> A.   Right.
>
> Q.   The night before you've - -
>
> A.   Right.
>
> Q. - - testified you were working.   Did you find a gun on him that night - -
>
> A.   No, I didn't.
>
> Q. - - or see a gun?
>
> A.   No, I didn't.

Q.   All right.

A.   I didn't see one or not on him.   No.

Q.   Okay.   Were you aware at some point that there was [a] gun found?

A.   Well, I know the security lady had passed him one - -

Q.   Okay.   Tell us about - -

A.   - - **that same week**.

Q.   The security lady, is that Tootie?

A.   I guess that's her name.   Yeah.

(Emphasis added.)   Given the fact that White's testimony was only "that week," the prior gun possession was not temporally nor spatially proximate.   Because the shooting occurred on a Saturday night and White's trial testimony was that Dennis was given a gun "that week," in reality, the prior occasion may have been as remote as five to six days earlier. Significantly, Detective Geiger's testimony affirmed the fact that White did not tell him in the early stages of the investigation when he saw Dennis in possession of a gun. Geiger testified as follows:

Q.   All right.   Let me ask you this:   Were you aware of what we heard from [White] yesterday about this .25 gun that he saw that the defendant had the night before the shooting?   Did you know that initially?

A.   I didn't - - I'd known when I spoke with him he had mentioned that he that he had previously seen the defendant with a .25.

Q.   Had he been more specific as to when, though?

A.   **He was not specific as to when**.   And he had also stated that

he had seen the defendant hand his gun to someone before, but he didn't

specify to who.

(Emphasis added.) Furthermore, the gun was not recovered, and there was no evidence it was inextricably related to the homicide. Hence, in my view, it was mere propensity evidence which was inadmissible. Possession and use are not equivalent.

{¶ 47} Admittedly, sometimes it is difficult to assess the true purpose of other acts evidence when courts simply conclude it was used to establish identity. But the analysis becomes imprecise when the prosecutor argues a temporal proximity of one night that is not borne out by the testimony.

{¶ 48} As noted by the First District in *State v. Carusone*, 1st Dist. Hamilton No. C-010681, 2003-Ohio-1018, ¶ 27-29:

Evidence of other crimes, wrongs or bad acts independent of, and unrelated to, the offenses for which a defendant is on trial is generally inadmissible to show criminal propensity. *State v. Woodard,* 68 Ohio St.3d 70, 1993-Ohio-241, 623 N.E. 2d 75. In *State v. Smith* (1992), 84 Ohio App. 647, 660, 617 N.E.2d 1160, the Second Appellate District, citing 1 Weissenberger, Ohio Evidence (1993), Sections 404.4 and 404.23, stated as follows:

The basic thrust of Evid.R. 404 concerns the propensity rule, which is a basic principle that evidence of a person's character trait is not admissible for the purpose of proving that he acted in conformity with his character on a particular occasion. It prohibits

use of propensity to demonstrate actions conforming to the propensity. It creates a forbidden inferential pattern, in which character or a trait of it used to show propensity and to demonstrate therefrom conforming conduct. The policy of the rule is not based on relevance but on the danger of prejudice.

* * *Evid.R. 404(B) [is] to be strictly construed against admissibility. *See State v. DeMarco* (1987), 31 Ohio St.3d 191, 509 N.E.2d 1256; *State v. Griffin* (2001), 142 Ohio App.3d 65, 753 N.E.2d 467; *State v. Brown* (Oct. 25, 1995), 1st Dist. No. C-940771. * * *

**{¶ 49}** Without question, the gun possession evidence adduced here clearly failed the "identity" criteria as set forth in *Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841*,* at ¶ 88:

Other acts can be evidence of identity in two situations. *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994). "First are those situations where other acts 'form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment,' and which are 'inextricably related to the alleged criminal act.' " *Id.* at 531, 634 N.E.2d 616, quoting *State v. Curry*, 43 Ohio St.2d 66, 73, 330 N.E.2d 720 (1975). "Other acts may also prove identity by establishing a *modus operandi* applicable to the crime with which a defendant is charged. 'Other acts forming a unique identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B).' " *Lowe* at 531,

634 N.E.2d 616, quoting *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990), syllabus. " 'Modus operandi' literally means method of working." *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 37. "It is evidence of a signature, fingerprint-like characteristics unique enough 'to show that the crimes were committed by the same person.' " *Id.*, quoting Weissenberger, *Federal Evidence*, Section 404.17 (7th Ed.2019).

**{¶ 50}** The other acts evidence herein was not part of the immediate background and did not establish a behavioral footprint associated with the homicide in question. Indisputably, both the federal and state constitutions permit an individual to possess a gun, albeit, I recognize, not inside a liquor establishment. White's testimony was non-specific and merely evidence of propensity.

**{¶ 51}** It was error to admit this evidence. However, given the video corroboration of the State's testimonial evidence, I would find the error was harmless.

TUCKER, P.J., concurring:

**{¶ 52}** Though I concur in the lead opinion, I write separately to state my reasoning for concluding that the trial court did not err by allowing the admission of the evidence regarding Dennis's prior (but recent) possession of a .25 caliber handgun when he was at Sugar's. In *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, the Supreme Court restated and, to some extent, refined the analysis regarding admission of other acts evidence under Evid.R. 404(B). When this analysis is applied to the contested

evidence in this case, I conclude that Dennis's recent possession of a .25 caliber handgun while at Sugar's was relevant under Evid.R. 401(A) to establish a proper Evid.R. 404(B) purpose, and I cannot conclude that the admission of the evidence was an abuse of discretion based upon an Evid.R. 403(A) conclusion that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

{¶ 53} The admissibility determination begins with an analysis of whether the other-acts evidence is relevant to a permissible - nonpropensity purpose. *Hartman* at ¶ 26. "The nonpropensity purpose * * * must go to a 'material' issue that is actually in dispute between the parties." *Id.* at ¶ 27, quoting *Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d 777 (1988). A component of the relevancy determination is "some threshold showing that the act for which the evidence is offered occurred[,] 'and that the defendant was the actor.' " *Id.* at ¶ 28, quoting *Huddleston* at 689. This part of the relevancy analysis prevents jury consideration of an "unsubstantiated accusation." *Id.* This first step in the analysis "is a question of law." *Id.* at ¶ 22, citing *The New Wigmore: Evidence of Other Misconduct and Similar Events*, Section 4.10 (2d Ed.2019).

{¶ 54} Assuming a determination that the evidence is relevant to establish a permissible other-acts purpose, the next step in the analysis is a determination under Evid.R. 403(A) whether the relevance of the other-acts evidence is substantially outweighed by the danger of unfair prejudice, issue confusion, or that the jury will be misled. This determination will "generally" turn "on the degree to which the [nonpropensity] fact is actually contested." *Hartman* at ¶ 31. If the other act is not

"genuinely disputed or material to the case, then it has little probative value and the risk of prejudice is high." (Citations omitted.) *Id.* On the other hand, as the importance of the other-acts evidence to the "resolution of the case increases, the probative value of the evidence also increases and the risk of *unfair* prejudice decreases." (Emphasis sic.) *Id.* In the end, if the evidence is "only slightly probative of a nonpropensity theory [and] has a high likelihood of prejudicing the defendant * * *, the evidence must be excluded." *Id.* at ¶ 33. A trial court's determination of admissibility under Evid.R. 403(A) is reviewed for an abuse of discretion. *Id.* at ¶ 30.

{¶ 55} In this case, Dennis's recent possession of a .25 caliber handgun while at Sugar's made it more probable that it was Dennis, as opposed to Williams, who shot Reece. Thus, the handgun possession evidence was relevant to the identity of the shooter which, of course, is a permissible, nonpropensity purpose. Moreover, White's testimony regarding his observation of a .25 caliber handgun being passed from Tootie to Dennis was a sufficient threshold showing that the other act did occur and that Dennis was the actor. In short, the trial court did not commit an error of law by allowing the admission of Dennis's recent possession of a .25 caliber handgun while at Sugar's.

{¶ 56} Turning next to the Evid.R. 403(A) analysis, I cannot conclude that the admission of the other-acts evidence was an abuse of discretion. The nonpropensity fact at issue was, as discussed, the identity of the shooter (Dennis or Williams), with this being the central dispute for the jury to resolve. Moreover, the fact that White's observation of Dennis's handgun possession may have occurred approximately a week before the murder did not sufficiently diminish the evidence's value to the identity

determination such that I would conclude that the trial court abused its discretion by allowing the admission of the evidence.

{¶ 57} Based upon the above discussion, I concur in the other-acts portion of the lead opinion, and I otherwise concur in the lead opinion.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Craig M. Jaquith
Hon. Mary E. Montgomery