[Cite as *State v. Sodders*, 2022-Ohio-3513.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29354 |
| | : | |
| v. | : | Trial Court Case No. 2021-CR-839 |
| | : | |
| CHARLES R. SODDERS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of September, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

DAVID E. STENSON, Atty. Reg. No. 0042671, 131 North Ludlow Street, Suite 316, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Charles R. Sodders was found guilty after a bench trial of five counts of sexual battery (by a parent), all felonies of the third degree. The trial court imposed an aggregate sentence of 10 years in prison. Sodders appeals from his convictions, claiming that his trial counsel provided ineffective assistance when presenting his case-in-chief. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} On March 22, 2021, Sodders was indicted on three counts of sexual battery, in violation of R.C. 2907.03(A)(5), related to sexual conduct with S.A., his 23-year-old daughter (the A Indictment). Three months later, the State added two additional charges of sexual battery related to sexual conduct with O.S., his 18-year-old daughter (the B Indictment). Sodders waived his right to a jury trial, and the matter proceeded to a bench trial in August 2021. The State's evidence at trial established the following facts.

{¶ 3} S.A. and O.S. are biological sisters, and Sodders is their biological father. Neither daughter was raised by Sodders, nor was he involved in most of their childhoods. S.A. was placed in another home as a young child and was not raised with O.S.

{¶ 4} In late 2016 or early 2017, S.A. got in touch with one of her biological sisters, who directed her toward her biological mother. S.A.'s biological mother informed S.A. that her father was on Facebook. S.A. began to have in-person contact with Sodders, supervised by her adoptive mother. In the fall of 2020, S.A. connected with then 17-year-old O.S., who was in foster care. Around the same time, O.S. found Sodders on Facebook and began to communicate with him. O.S. needed a place to live after she turned 18, and Sodders invited her to stay with him.

{¶ 5} On her 18th birthday, O.S. met S.A., S.A.'s adoptive mother, and Sodders, and the group spent time celebrating O.S.'s birthday. O.S. expected to live with Sodders and his girlfriend, Mary Grisby, but Sodders and Grisby got into an argument and broke up. Sodders moved from Grisby's apartment to a house in Englewood owned by his brother, and O.S. moved with him. Another man (not Sodders' brother) lived at the house, as well.

{¶ 6} O.S. stated that she shared a bed with Sodders in his room, unless she was angry with him and then she slept on the couch. O.S. testified that she was "dating him [Sodders] basically" and that Sodders told her that he was in love with her and wanted to marry her. O.S. had responded, "how can that possibly happen when I'm your daughter." O.S. stated that sometimes she was distant with Sodders, because "he was not being honest like about his actual [sic] being my dad." O.S. testified that she had vaginal intercourse with Sodders more than once, "but not all the time."

{¶ 7} S.A. visited Sodders' home multiple times as she and O.S. got to know each other better. Sometimes S.A.'s boyfriend came with her, and when he did, Sodders slept on the couch. When S.A. stayed overnight without her boyfriend, she, O.S., and Sodders shared a bed. One night near the end of February 2021, when S.A. came out of the shower at Sodders' home, Sodders touched S.A.'s breasts, said "nice tits," and told her that it gave him a "boner."

{¶ 8} According to S.A., Sodders raped her the next night. While S.A. was lying on Sodders' bed, Sodders touched her "vagina area" with his tongue and also penetrated her with his penis and fingers. S.A. thought O.S. was nearby, sitting in a chair. O.S.

later joined them on the bed, and S.A. heard O.S. "moaning and groaning loudly" as she and Sodders engaged in sex. S.A. testified that when she woke up the next morning, she was very scared, wet, sore in her private area, and naked. She did not remember being naked when she went to bed.

{¶ 9} O.S. described the incident differently. She stated that she touched S.A. "one time and then we all three kind of got to sexual intercourse together." O.S. saw Sodders' penis touching S.A.'s vagina and he "tried to get it in her but her legs were like not all the way wide open" because S.A. was dozing off. O.S. testified that she watched the encounter, and Sodders did not penetrate S.A. with his penis and did not touch S.A.'s vagina with any other part of his body. O.S. and Sodder then engaged in sexual intercourse.

{¶ 10} S.A. did not immediately report the incident to the police. She explained that Sodders had "extreme anger" and she was fearful. Approximately 7 to 10 days after the incident, S.A. told Grisby, who she considered a mother figure, and then the police were contacted. On March 4, 2021, Detective Alan Meade spoke with S.A. about the allegation, and then he subsequently contacted Grisby and S.A.'s adoptive mother.

{¶ 11} On March 9, Meade had a telephone conversation with Sodders and informed him that S.A. had accused him of raping her. Sodders replied that the intercourse was consensual and that he had a witness. Meade asked if the witness was O.S., and Sodders responded affirmatively. When Meade asked Sodders for his version of the events, Sodders told the detective that O.S. and S.A. were in his bed and S.A. had asked him to have sexual intercourse with her. Sodder reported to Meade that he

digitally penetrated S.A. and attempted to have intercourse with her by inserting his penis into her vagina, but he could not get it in. Sodders also said that he felt bad because S.A. was his daughter and, therefore, he stopped. Sodders told the detective that he then had sexual intercourse with O.S. He claimed the encounters were consensual.

{¶ 12} According to Detective Meade, Sodders said that he had had intercourse with S.A. only that one occasion, but that he had had sex with O.S. multiple times. Sodders added that he did not think that O.S. was his biological daughter as there had never been any paternity test. Sodders acknowledged that S.A. was his daughter.

{¶ 13} Detective Meade spoke with O.S. later that afternoon, and she also provided an oral account of the incident. A few days later, Detective Meade arrested Sodders. O.S. testified that she was very upset that Sodders was being arrested, and she told the police that she was not certain that Sodders was her father.

{¶ 14} Meade collected DNA samples from Sodders, O.S., and S.A. Subsequent laboratory analysis confirmed that Sodders was their biological father.

{¶ 15} Stephania Kuth, a friend of Grisby, also testified for the State. She stated that she had visited with Sodders at his residence after Sodders moved out of Grisby's apartment, and she was familiar with both O.S. and S.A.; Sodders had introduced them to Kuth as his daughters. After O.S. came to live with him, Sodders told Kuth that he and O.S. were having sex, that he wanted a son with her, and that he was going to take her to another state and marry her. Sodders also told Kuth that he was having sex with S.A. Kuth testified that Sodders described an incident where S.A. and O.S. were "lying on the bed with him and he was rubbing both of their vaginas and made a statement, 'I

made these; these are mine.' " Kuth also contacted the police, although it is unclear when she made her report.

{¶ 16} Sodders testified on his own behalf at trial. He stated that he moved out of Grisby's residence on February 7, 2021, and relocated to a home owned by his brother. O.S. moved with him, and another man also resided there. Sodders testified that the home had three bedrooms: one used by him, one used by the roommate, and one was locked.

{¶ 17} Sodders denied that he had had sex with O.S. while living at Grisby's apartment, but he acknowledged that they had intercourse at least two times after he moved to the house. Specifically, Sodders testified:

Q: Okay. And did you have any sexual relations with [O.S.] at the [Englewood] address?

A: About the third weekend probably, yes.

Q: Okay. And did you have – at least two times did you have sexual intercourse with [O.S.]?

A: At least two times?

Q: Yes, uh-huh.

A: Yes.

Trial Tr. 91-92. On cross-examination, Sodders agreed that he was not disputing that he and O.S. had had a sexual relationship. *Id.* at 104.

{¶ 18} Sodders indicated that S.A. and her boyfriend began coming to visit around February 18 or 19, and she started spending the night a couple days later. According to

Sodders, O.S., S.A., and the boyfriend slept in a front bedroom, and he (Sodders) shared a bed with O.S. and S.A. only one time.

{¶ 19} Sodders testified that the incident began when S.A. asked him to "come F me." According to Sodders, S.A. was naked, and he came to the bed with his clothes on. He testified, "I couldn't get aroused and I – I tried to touch her but I couldn't do that neither so I just got away from her." Sodders denied that he had had intercourse with her, digitally penetrated her, or rubbed her vagina. On cross-examination, he clarified that he touched S.A. "above the hairline of the vagina, * * * rubbing the G spot no one knows about." Sodders acknowledged that he ended up having sexual relations with O.S. Sodders noted that he had heard S.A. having sex with her boyfriend earlier that day and she had complained that it hurt.

{¶ 20} When asked about his relationship with O.S., Sodders replied that "some part of me felt like I was her father." He indicated that both children had been removed from his parental care and his parental rights had been permanently terminated. Sodders stated that no genetic testing had been done to establish paternity. He indicated that he "felt bad" when he learned from the lab report that he was, in fact, O.S.'s father. Sodders stated that there was never any doubt that he was S.A.'s father.

{¶ 21} Sodders denied that he spoke with Kuth about having sexual relations with his daughters. He described Kuth as "a friend of Mary's that keeps trying to ruin our relationship." When asked about his relationship with Kuth, Sodders responded, "I've only had sex with her." Sodders also disagreed that he told Detective Meade that he had sex with S.A. Sodders testified that he only said that he had tried to rub her and

could not do it.

{¶ 22} After the parties filed post-trial memoranda, the trial court found Sodders guilty of all charges. The court imposed 60 months in prison for the charges in the A Indictment, to be served concurrently with each other, but consecutively to 60-month sentences for the charges in the B Indictment. Sodders' aggregate sentence was 10 years in prison. The trial court also designated Sodders a Tier III sex offender and ordered him to pay $50 per offense to the Rape Crisis Trust Fund, plus court costs.

{¶ 23} Sodders appeals from his convictions.

## II. Ineffective Assistance of Counsel

{¶ 24} In his sole assignment of error, Sodders claims that his defense counsel rendered ineffective assistance at trial when he questioned Sodders about his sexual conduct with O.S. during direct examination. Sodders notes that R.C. 2907.03(A)(5) prohibits sexual conduct with another when the offender is the other person's natural parent, and it is a strict liability offense. He argues that defense counsel thus elicited a confession to the offenses regarding O.S. and "remov[ed] all doubt as to his culpability."

{¶ 25} To establish ineffective assistance of counsel, a defendant must demonstrate both that (1) trial counsel's conduct fell below an objective standard of reasonableness and (2) the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). The first prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment." *Strickland* at 687; *State v. Dennis*, 2d Dist. Montgomery No. 29266, 2022-Ohio-2888, ¶ 37. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 689.

**{¶ 26}** The record reflects that defense counsel expected Sodders to testify at trial, and his apparent trial strategy was to distinguish Sodders' behavior with O.S. from his behavior with S.A. and to raise different challenges to the two sets of charges. In his opening statement, defense counsel informed the trial court:

It's anticipated that my client will testify in this case and he will be refuting the allegations that are made by [S.A.] that he engaged in any type of sexual conduct.

In terms of the individual by the name of [O.S.], I believe he will admit that he had – he had sexual intercourse with that child.

So I think that issue with – in terms of [O.S.] is that even though he was the – he is then determined to be the biological father of this child, when he engaged in relations with her, he did not know for certain that he was the biological parent of this child.

And also that his parental rights have been terminated by law,

removed and he – it's Defendant's contention that – that because of that this was actions between consenting adults and there should not be any criminal liability to him.

Trial Tr. 16-17.

{¶ 27} Defense counsel's trial strategy was not unreasonable. Because Sodders elected to testify at trial, he was subject to cross-examination by the prosecutor, who was likely to ask Sodders whether he had engaged in sexual conduct with his daughters. By asking Sodders about his behavior with his daughters himself, defense counsel was able to present the circumstances in a manner more favorable to Sodders. In addition, by asking Sodders about his sexual conduct with O.S., which Sodders then admitted, defense counsel could have reasonably sought to establish that Sodders was testifying truthfully when he denied S.A.'s version of events.

{¶ 28} Notably, there were significant differences in Sodders' conduct with his two daughters. O.S. testified to a consensual "dating" relationship with Sodders with ongoing sexual activity. Sodders reportedly confirmed that relationship in statements to Detective Meade and Kuth. He disputed, however, that he knew that O.S. was his biological daughter at the time. In contrast, S.A. accused Sodders of raping her, and her version of events differed from both Sodders' and O.S.'s testimony. Sodders did not dispute S.A.'s paternity but contested that he had engaged in sexual conduct with her. Defense counsel's approach focused on the areas where the trial court, as trier of fact, arguably might find a basis to acquit.

{¶ 29} Additionally, whether the sexual conduct between Sodders and O.S. was

consensual was relevant to whether Sodders was subject to classification as a sex offender. Sexual battery is a sexually oriented offense, *see* R.C. 2950.01(A)(1), and generally, one who commits it will be classified as a Tier III sex offender. R.C. 2950.01(B)(1) and 2950.01(G)(1)(a). However, an offender is statutorily exempt from classification if the sexually oriented offense involved consensual conduct with a victim who was at least eighteen and who was not under the custodial authority of the perpetrator. R.C. 2950.01(B)(2)(a); *see State v. Raber*, 134 Ohio St.3d 350, 2012-Ohio-5636, 982 N.E.2d 684, ¶ 2; *State v. Shockey*, 2019-Ohio-2417, 139 N.E.3d 486, ¶ 9 (9th Dist.). Sodders' testimony reinforced O.S.'s testimony that their conduct was consensual.

{¶ 30} In short, defense counsel's questioning of Sodders fell within the ambit of "debatable trial tactics." Given Sodders' decision to testify, defense counsel may have reasonably believed that his questions regarding Sodders' sexual conduct with O.S., although incriminating, nevertheless provided Sodders the best opportunity for a favorable outcome on some, if not all, of the charges.

{¶ 31} Finally, even if defense counsel had acted deficiently by questioning Sodders about whether he engaged in sexual conduct with O.S., the record does not reflect a reasonable probability that the outcome of the trial would have been different. O.S. testified that she had vaginal intercourse with Sodders on multiple occasions, and Sodders admitted to having sex with O.S., both to Detective Meade and to Kuth. S.A. also testified that she heard Sodders and O.S. having sex beside her. On the record before us, we cannot find that a reasonable probability exists that Sodders would have

been acquitted of the charges involving O.S. absent defense counsel's questioning.

{¶ 32} Sodders' assignment of error is overruled.

### III. Conclusion

{¶ 33} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and LEWIS, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
David E. Stenson
Hon. Dennis J. Adkins